# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 6, 2001 Session

## STATE OF TENNESSEE v. JENNIFER GALE MCCLURE

### Appeal from the Circuit Court for Haywood County
### No. 4217     Donald H. Allen, Judge

---

### No. W2000-01822-CCA-R3-CD - Filed June 27, 2001

---

This is an appeal by permission pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. The Defendant, Jennifer McClure, was indicted by the Haywood County Grand Jury for various charges arising out of the seizure and subsequent search of the commercial motor carrier in which she and her husband were traveling. The trial court suppressed the evidence obtained as a result of that seizure and search, ruling that the seizure of the motor carrier was unconstitutional. The State then filed a motion for an interlocutory appeal, which was granted by the trial court. This Court likewise granted the State's application for permission to appeal. On appeal, the State asserts: (1) that the trial court abused its discretion by refusing the State's request to either reopen the proof or be allowed to file with the court the rules and regulations governing Department of Safety inspections; and (2) that if these rules and regulations are considered, the trial court erred by granting the Defendant's motion to suppress. We conclude that the trial court did not abuse its discretion by refusing the State's request to reopen the proof or to file the applicable rules and regulations because the trial court did permit the State to file with the court the rules and regulations regarding Department of Safety inspections. In addition, we hold that the trial court did not err by granting the motion to suppress because the seizure of the Defendant's commercial motor carrier was conducted in violation of the Fourth Amendment's protections against unreasonable searches and seizures.

### Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J. and NORMA MCGEE OGLE, J., joined.

David M. Livingston, Brownsville, Tennessee, for the appellee, Jennifer Gale McClure.

Paul G. Summers, Attorney General and Reporter; Kim R. Helper, Assistant Attorney General; and Clayburn L. Peeples, District Attorney General, for the appellant, State of Tennessee.

**OPINION**

On June 3, 1998, the Defendant was in the sleeper compartment of the commercial motor carrier driven by her husband, when the vehicle stopped to be weighed at the westbound scales on Interstate 40 in Haywood County. Although the Defendant was not driving the vehicle, both she and her husband were licensed commercial vehicle drivers who worked as a driving team; they would each take turns driving the motor carrier. The vehicle was detained for a "safety inspection," and the contents were searched after the Defendant and her husband granted consent to search. During the search, contraband was found in the Defendant's overnight bag. Following indictment for possession of the contraband, the Defendant filed a motion to suppress the evidence obtained from the search.

On September 7, 1999, a suppression hearing was conducted. At that hearing, Officer Chris Rollins with the Tennessee Commercial Vehicle Enforcement Division of the Tennessee Department of Safety testified that on June 3, 1998, he was working the westbound commercial vehicle weigh station on Interstate 40 in Haywood County. All commercial vehicles must stop at the scales to be weighed, and the truck in which the Defendant was riding stopped at the scales around nine o'clock p.m. Officer Rollins made the decision to detain the Defendant's vehicle for a safety inspection.

Officer Rollins testified that not all vehicles which stop at the scales are subjected to a safety inspection. The officers generally conduct two to six safety inspections per day. Decisions on whether to conduct safety inspections are made by the officers on duty on a random basis. The decisions may be based on the number of officers working and the corresponding number of vehicles coming through the scales. If the scales are short on manpower, trucks are less likely to be detained for safety inspections. Also, the physical appearance of the driver may be considered; if the driver looks tired, the truck may be detained.

Officer Rollins explained that when a truck is detained for a safety inspection, the officer verbally interviews the driver and checks the driver's logs, fuel receipts, registration, tires, and "just several different things." He agreed with counsel for the State that the officers inspect for compliance with the safety regulations established by the Federal Department of Transportation, which have been adopted by the State of Tennessee. He stated that the officers enforce both state and federal laws. Officer Rollins testified that the officer doing the inspection generally gets inside the cab of the truck to fill out the paperwork, and the officer makes a visual inspection of the cab for alcohol or contraband that might be in plain view. He said that the officer would not ordinarily look inside personal bags or suitcases during a safety inspection. However, he also testified that it is common practice among the officers to ask for consent to conduct a more thorough search of the vehicle. Officer Rollins admitted that the principal focus of the "safety inspections" conducted by the officers was to eradicate the possession of narcotics by commercial vehicle drivers.

On the night in question, Officer Rollins was working the scales when the Defendant's vehicle entered. Officer Rollins did not notice any safety violations while the Defendant's vehicle was being weighed, and the vehicle was within the weight limits established by law. Officer Rollins

had no reason whatsoever to believe that the vehicle was not in compliance with the safety regulations concerning commercial vehicles in this state. However, Officer Rollins recognized the name of the trucking company for which the Defendant and her husband were driving, and he testified that the company had a reputation for employing drivers who would be in possession of alcohol and drugs. Therefore, without any reasonable suspicion to suspect that the Defendant's vehicle was in violation of any safety regulations, Officer Rollins made the decision on the spot to detain the vehicle for a safety inspection.

Officer Rollins had the vehicle pull around to a different part of the weigh station for the safety inspection. When it complied, Officer Rollins, along with Officer Richardson, asked both the Defendant and her husband for consent to search the vehicle. The Defendant was in the sleeper compartment of the truck, and she was allowed to get dressed and come out of the vehicle to be interviewed by the officers. Officer Rollins testified that the Defendant and her husband voluntarily consented to a search of the vehicle without any coercion by the officers, and they signed the consent form, which had been read to them. The officers then searched the interior of the truck, and they found contraband in the Defendant's overnight bag, which was in the sleeper compartment of the truck. The items were seized and the Defendant and her husband were arrested.

Once the contraband was found in the vehicle, the "safety inspection" ceased. Officer Rollins testified that it is the Department of Safety's policy to terminate the safety inspection when narcotics are found. The safety inspection was never begun anew. Once the Defendant and her husband were released on bond, they were permitted to leave with the truck without a safety inspection ever taking place.

Officer Kenny Feathers, also with the Commercial Vehicle Enforcement Division of the Department of Safety, was not present when the Defendant's vehicle was searched, but he testified regarding the duties and practices with respect to enforcing the commercial vehicle regulations. He testified that the inspection site is automated, and about five percent of the trucks coming in for a safety inspection are "pulled in by the computer." He did not further explain how this computer system operated. However, he testified that the officer monitoring the scales will visually inspect the vehicle on the scales, and if the officer "feels like" the vehicle needs to be further inspected "for whatever reason," the officer may pull the vehicle around for a safety inspection. "Depending on the level of inspection that is done," the officer may get inside the cab of the truck. Officer Feathers testified that the safety inspections are done within the guidelines of the Commercial Vehicle Safety Alliance, which has been adopted by the State of Tennessee, and that the laws and regulations regarding safety that are enforced are those adopted from the Federal Motor Carrier Safety Regulations. The officers enforce state and federal laws and regulations.

Officer Feathers testified that whether a vehicle is detained for a safety inspection may depend on many factors. Mostly it depends on the particular officer working the scales and how far behind the officer may be on the number of inspections. Officer Feathers testified that the inspection site is required to check thirty-three trucks per year in order to retain its certification through the federal government. However, the officers themselves are not given further directions from the

Captain or the division heads as to how many trucks to inspect, "[a]nd it depends on the particular officer on how many he needs to check that day or how many he feels like he wants to check that day."

Officer Feathers, like Officer Rollins, testified that the safety inspection ends if narcotics are found. He also testified as to his belief that drivers for the company which employed the Defendant are very likely to be in possession of narcotics. Nevertheless, he would not agree with Officer Rollins' statement that the principal reason for conducting a safety inspection is the eradication of drugs.

The Defendant testified that she was asleep in the sleeper compartment of the truck when she was awakened by Officer Richardson, who was asking her to step out of the vehicle. She testified that Officer Richardson told her that the officers were going to search the truck and that she needed to sign the consent form. When she questioned him, Officer Richardson told her that the owner of the trucking company was working with the officers to eradicate the use of drugs and that the owner had already given the officers permission to search the truck. The Defendant said that she then asked why she needed to sign the consent form if the officers already had permission to search, and the officer responded, "Well, you might as well sign it because we're going to search it anyway." The Defendant then signed the consent form. She said that the consent form was never read to her or explained to her, and she was never informed that she had the right to refuse the search. She said she did not really understand what would be searched, but she knew they were searching for drugs.

After hearing this evidence, the trial judge stated that he accredited the testimony of Officer Rollins regarding the consent form and that he believed the consent to search was voluntarily given. However, he expressed questions about the legality of the original seizure, and he took the case under advisement while awaiting the decision of this Court in State v. Edward Carl Womack, No. W1999-01257-CCA-R3-CD, 1999 WL 1097971 (Tenn. Crim. App., Jackson, Nov. 29, 1999), which was then pending before this Court. Our decision in Womack was filed on November 29, 1999. See id. The issue on appeal in Womack was similar to the one presented in this case. In that case, the defendant pled guilty to possession of a controlled substance, but reserved a certified question of law relating to the legality of the seizure of his commercial truck for a "more thorough safety inspection" without any suspicion of wrongdoing or safety violations. Id. at *1. While recognizing that the "pervasively regulated business doctrine," which permits warrantless searches of certain commercial property without a warrant, is applicable to motor carriers, this Court held that the State failed to prove that the seizure was lawful under the pervasively regulated business doctrine: no rules, regulations, or policy decisions promulgated by the Tennessee Department of Safety were in the record; thus, the record was "devoid of proof that the appellant's seizure, including his detention for further inspection, was conducted pursuant to valid regulations and rules which would satisfy the pervasively regulated business doctrine and excuse the requirement of a warrant." See id. at *6. In reaching this conclusion, we noted that while a court must take judicial notice of statutes, a court is not mandated to take judicial notice of rules and regulations; indeed, before a court may take judicial notice of a rule or regulation published by a state agency, a party must request that the court take such judicial notice and must give reasonable notice to the adverse party. Id.; Tenn. R. Evid. 202(b).

Because this procedure was not followed in <u>Womack</u>, neither the trial court nor this Court could take judicial notice of the rules and regulations. <u>Womack</u>, 1999 WL 1097971, at *6.

Subsequently, on January 6, 2000, the State filed a motion requesting the trial court to take judicial notice of all applicable rules and regulations of the Tennessee Department of Safety pursuant to Rule 202 of the Tennessee Rules of Evidence and our decision in <u>Womack</u>. The State also requested that the court allow presentation of further proof as necessary regarding the Defendant's motion to suppress.

On January 21, 2000, without ruling on the State's motion, the trial judge filed a memorandum in which he made findings of fact regarding the suppression hearing and determined that the seizure of the Defendant's vehicle was unconstitutional. Specifically, the judge found the following:

> The Court finds that Officer Chris Rollins with the Commercial Motor Vehicle Enforcement Agency did on a <u>random</u> basis and without belief that Mr. or Mrs. McClure was in violation of any law whatsoever, . . . order the defendant (Ms. McClure, the passenger) and her husband (Mr. McClure, the driver) to pull their tractor-trailer to the rear of the safety inspection scales site for further "safety inspection." This Court finds that Officer Rollins did not possess "any quantum of individualized suspicion" that the defendant had committed or was committing a criminal offense prior to detaining her and her husband for a more thorough "safety inspection." The State has failed to show that the actions of the enforcement officers of the Tennessee Department of Safety [were] based upon "any reasonable belief" that the motor vehicle occupied by the McClures was being operated in violation of any provisions of the Motor Vehicle Carries [sic] Statute or any other state laws. Furthermore, the Court finds that this warrant-less seizure was not carried out pursuant to a plan embodying explicit neutral limitations on the conduct of the officers, but instead was totally at the officer's discretion to seize this particular vehicle for the purpose of searching for drugs and/or other contraband that might be found therein. As much, this Court finds that this seizure and subsequent search of this motor vehicle was not constitutionally reasonable.

> Likewise, this Court finds that the State has failed to carry its burden under the "pervasively regulated business doctrine" which is applicable to motor carriers such as in this case. The defendant's seizure was not pursuant to any valid regulations or rules of policy of the Department of Safety, but was clearly a random decision by Officer Rollins to conduct a "safety inspection" for the purpose of searching for illegal narcotics.

After receiving this memorandum, the State filed a motion to reconsider, or in the alternative, to be able to make an offer of proof and seek interlocutory appeal. The trial court conducted a hearing on April 24, 2000 regarding the State's motion. At that hearing, the State asked the trial

court to consider the rules and regulations which it believed made the seizure of the Defendant's commercial vehicle lawful and to hear additional proof from one or more of the ranking officers within the Department of Safety regarding the general policies and practices at these inspection stations. The trial court declined to allow the State to put on additional testimony, finding that the officers had already testified as to why they did certain things on the evening of the search, but the trial court did state, "I think the Court can take judicial notice of this regulation and I don't mind if you want to put this into evidence as an exhibit." The court recognized that the regulations do permit safety inspections, but again concluded that the seizure was unlawful because it took place at the sole discretion of the enforcement officer who was not acting pursuant to any plan limiting the discretion of officers in the field. Accordingly, it denied the State's motion to reconsider and to hear additional evidence, but it did permit the State to supplement the record with the rules and regulations regarding motor carriers. An order was entered suppressing the evidence against the Defendant, and this appeal followed.

## REFUSAL TO REOPEN PROOF

The State asserts that the trial court abused its discretion by not allowing the State to reopen its proof to offer the rules and regulations regarding safety inspections relied upon by the Department of Safety. A motion to reconsider or to reopen the proof taken at a suppression hearing is a matter within the sound discretion of the trial court, and this Court will not interfere with that discretion absent a showing that an injustice occurred as a result of the denial of the motion. See State v. Moore, 775 S.W.2d 372, 375 (Tenn. Crim. App. 1989); State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985). Before we will find that an "injustice" occurred due to the denial of such a motion, "it must be established by the party aggrieved that the evidence sought to be introduced would establish that a different result would probably be reached by the trial judge in the resolution of the motion to suppress." More, 775 S.W.2d at 375.

The State asserts that consideration of the rules and regulations would have led to a different result in this case, thus the trial court erred by not permitting the State to reopen its proof. However, at the hearing on the State's motion to reopen the proof, the trial court did allow the State to file those rules and regulations, and it took judicial notice of them prior to entering the order suppressing the evidence. The trial court did not permit the State to put on additional witnesses to testify as to the policies and procedures of the Department of Safety. The court determined that it could consider the rules and regulations but that it would be improper to permit the State to put on additional witnesses who might testify contrary to the original witnesses. The court considered the State's argument at the hearing that the rules and regulations rendered the seizure lawful, but afterwards the court determined that the seizure was unconstitutional because no limits were placed on the discretion of the officers. Thus, the trial court admitted the evidence, considered the evidence, and nontheless found the seizure unconstitutional. Because the rules and regulations are part of the record in this case, this issue has no merit.

-6-

SUPPRESSION OF EVIDENCE

The State next argues that the trial court erred by granting the Defendant's motion to suppress because the warrantless seizure was justified pursuant to the "pervasively regulated business doctrine." When reviewing the grant or denial of a motion to suppress,

> [q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, the application of the law to the facts as found by the trial court is a question of law which the appellate court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

> The Fourth Amendment to the United States Constitution provides:
> Unreasonable searches and seizures.--The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Similarly, Article 1, § 7 of the Tennessee Constitution guarantees

> that the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

The intent and purpose of the prohibition against unreasonable searches and seizures found in the Tennessee Constitution has been found to be the same as that found in the Fourth Amendment to the Unites States Constitution. See State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998). According to the Supreme Court, the purpose of the prohibition against unreasonable searches and seizures in the Fourth Amendment is to "safeguard the privacy and security of individuals against arbitrary invasions of government officials." Camara v. Municipal Court, 387 U.S. 523, 528 (1967). The Fourth Amendment protects people, not places, wherever they may have a "reasonable expectation of privacy." Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J. concurring).

Under both the United States and the Tennessee Constitutions, a search or seizure conducted without a warrant is presumed unreasonable. See Coolidge v. New Hampshire, 403 U.S. 443, 454-

-7-

55 (1971); <u>Simpson</u>, 968 S.W.2d at 780; <u>State v. Watkins</u>, 827 S.W.2d 293, 295 (Tenn. 1992). Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless that search or seizure was conducted pursuant to one of the recognized exceptions to the warrant requirement. <u>See</u> <u>id.</u>

One such recognized exception to the warrant requirement is known as the "pervasively regulated business doctrine." <u>See</u> <u>New York v. Burger</u>, 482 U.S. 691, 699-703 (1987) (operation of a junkyard pervasively regulated); <u>Donovan v. Dewey</u>, 452 U.S. 594, 598-602 (1981) (coal mining pervasively regulated); <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307, 311-14 (1978) (warrantless inspections to enforce OSHA regulations not authorized by pervasively regulated business doctrine); <u>United States v. Biswell</u>, 406 U.S. 311, 315-17 (1972) (firearms pervasively regulated); <u>Colonnade Corp. v. United States</u>, 397 U.S. 72, 77 (1970) (liquor pervasively regulated). Although the Fourth Amendment's protections against unreasonable searches and seizures apply to private commercial property, under the pervasively regulated business doctrine, administrative searches of private commercial property conducted without a search warrant pursuant to legislative schemes authorizing such searches do not necessarily violate the Fourth Amendment. <u>See</u> <u>Dewey</u>, 452 U.S. at 598-99. This doctrine "reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections." <u>Id.</u> Because of the pervasiveness of government regulations in certain industries, business owners or operators in those "closely regulated" industries have a reduced expectation of privacy in their business operations. <u>See</u> <u>Burger</u>, 482 U.S. at 702. Indeed, "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." <u>Barlow's</u>, 436 U.S. at 313 (citation omitted).

Because of the reduced expectation of privacy in heavily or pervasively regulated businesses, the Supreme Court has determined that "the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context." <u>See</u> <u>Burger</u>, 482 U.S. at 702. However, in order to be reasonable under the Fourth Amendment, an administrative search or inspection pursuant to the pervasively regulated business doctrine must satisfy three criteria:

First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." For example, in <u>Dewey</u> [the Supreme Court] recognized that forcing mine inspectors to obtain a warrant before every inspection might alert mine owners or operators to the impending inspection, thereby frustrating the purposes of the Mine Safety and Health Act--to detect and thus to deter safety and health violations. Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the

-8-

law and has a properly defined scope, and it must limit the discretion of the inspecting officers.

Id. at 702-03 (citations omitted).

In Edward Carl Womack, this Court asserted its belief that the due to the extensive regulations regarding motor carriers, the pervasively regulated business doctrine would be applicable to motor carriers. Womack, 1999 WL 1097971, at *5-6. This Court also determined that if the warrantless seizure of the commercial vehicle in that case without any individualized suspicion of wrongdoing was to be upheld, its justification must rest on the pervasively regulated business doctrine. Id. at *6. Nevertheless, because the rules and regulations regarding motor carriers were not in the record, this Court was unable to determine whether the warrantless "safety inspection" conducted by officers from the Department of Safety met the requirements set forth in Burger for an administrative inspection. See id. at *6. In the case currently before us, the trial court did permit the State to introduce the rules and regulations applicable to motor carriers and did take judicial notice of those rules and regulations. Therefore, we may now address the issue which we could not reach in Womack.

Tennessee Code Annotated section 65-15-101 grants the Tennessee Department of Safety the power and authority "to supervise and regulate the transportation of persons and property by motor vehicle over or upon the public highways of this state, and to supervise and regulate certain businesses closely allied with such motor transportation." In so doing, the department has the duty to "license, supervise and regulate every motor carrier in the state and promulgate rules and regulations pertaining thereto." Tenn. Code Ann. § 65-15-106(a). As part of the department's authority to license, supervise and regulate motor carriers, the department "shall periodically promulgate such safety rules and regulations as the department deems necessary to govern and control the safety operations and safe use of equipment." Id. § 65-15-113(a). The statute also provides that the "department may inspect these motor vehicles for the purposes of safety." Id. § 65-15-113(b).

The rules and regulations promulgated pursuant to this statutory authority specifically adopt the Federal Motor Carrier Safety Regulations as the safety regulations in this state. See Tenn. Comp. R. & Reg. 1220-2-1-.20. Regarding safety inspections, the rules provide, "Every motor vehicle shall be maintained in a safe and sanitary condition at all times, and shall be at any reasonable time subject to inspection by the [Department of Safety] and its duly authorized representatives." Id. 1220-2-1-.23. The rules also provide, "Every motor vehicle subject to the safety jurisdiction of the [Department of Safety] must stop for inspection at any designated . . . inspection station or stop at a safe roadside location if directed by a[n] . . . enforcement officer." Id. 1220-2-1-.46(4). The Federal Motor Carrier Safety Regulations, which have been adopted by this state, set forth the minimum periodic inspections standards for safe operation of motor carriers. See 49 C.F.R. § 396.17(a), App. G. We have found no other rules or regulations relating to safety inspections in the rules and regulations filed with the court by the State, nor has the State asserted that any other rules

or regulations are applicable. Thus, we must determine whether these rules and regulations authorizing safety inspections without a warrant meet the test of reasonableness set forth in Burger.

First, we agree with the State that there is a "'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." Burger, 482 U.S. at 702. As stated by the Sixth Circuit Court of Appeals, "the safe operation of large commercial vehicles is critical to the welfare of the motoring public"; thus, the first requirement of Burger is satisfied. United States v. Dominguez-Prieto, 923 F.2d 464, 468 (6th Cir. 1991).[1] We likewise conclude that the second requirement of Burger, that the warrantless inspection be "'necessary to further [the] regulatory scheme,'" has been met. See Burger, 482 U.S. at 702 (citation omitted). In order to ensure that motor carriers are being operated in compliance with the safety regulations, the Department of Safety must be able to make periodic safety inspections. Because of the mobile nature of motor carriers, which pass quickly through states, in and out of the jurisdictions of the enforcement agencies, requiring a warrant prior to conducting a safety inspection would frustrate this goal. See Dominguez-Prieto, 923 F.2d at 469; Carroll v. United States, 267 U.S. 132, 153, 156 (1925) (holding that search of an automobile without a warrant is reasonable "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought," making it impractical to secure a warrant before searching the automobile). We also note that other jurisdictions have found commercial vehicle transportation to be a pervasively regulated business and that warrantless, periodic inspections are necessary to further the rules and regulations relating to safety; however, those jurisdiction have reached varied conclusions as to whether the third requirement of Burger was met, depending on the regulatory scheme at issue. See State v. Landrum, 739 N.E.2d 1159, 1165 (Ohio Ct. App. 2000) (holding stop of commercial vehicle unconstitutional when statute authorizing administrative safety inspections "conveys virtually complete discretion on the motor vehicle safety enforcement unit in deciding which trucks it will stop and when they may be stopped"); State v. Hone, 866 P.2d 881, 883 (Ariz. Ct. App. 1993) (holding statute failed to satisfy third prong of Burger test when statute did not limit the discretion of the officers at all; officers were free to stop any trailer or vehicle that may be transporting livestock or hides to search for certain documents with no requirement of suspicion of any violation). But see State v. Crum, 19 P.3d 172, 178 (Kan. 2001) (upholding constitutionality of statute which permitted stops of commercial vehicles at any time, at any place, and under any circumstances to ensure compliance with laws, rules and regulations applicable to motor carriers); State v. A-1 Disposal, 415 N.W.2d 595, 600 (Iowa 1987) (upholding

---

[1]In Dominguez-Prieto, the Sixth Circuit Court of Appeals determined that the warrantless search of the defendant's commercial vehicle did not violate the defendant's Fourth Amendment rights because it was made pursuant to the pervasively-regulated business doctrine. Id. at 165. That case also dealt with a Tennessee motor carriers statute, but not the one at issue here. The defendant in Dominguez-Prieto was searched pursuant to Tennessee Code Annotated section 65-15-106, which permits enforcement officers, upon reasonable belief that a motor vehicle is being operated in violation of any provisions of the motor carriers statutes, to require the driver to stop and submit to inspection for the purpose of comparing the contents of the vehicle with bills of lading, waybills, invoices, or other evidence of ownership or of transportation for compensation. Of particular importance to the Sixth Circuit in upholding the regulatory scheme was the limitation on the officers' discretion, especially the requirement that the officers have a reasonable belief of a violation prior to stopping the vehicle. 923 F.2d at 469. The statue at issue in Dominguez-Prieto is therefore distinguishable from the statute and rules at issue here, which authorize a safety inspection without any type of individualized suspicion.

constitutionality of random seizures of commercial vehicles for weighing at temporary checkpoints during daylight hours as authorized by statute).

Looking at the regulatory scheme at issue in this case, we conclude that the third requirement of Burger has not been satisfied. Burger requires that the "'inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" Burger, 482 U.S. at 703 (citation omitted). The Supreme Court explained this requirement as follows:

> In other words, the regulatory statute must perform the two basic functions of a warrant: It must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be "carefully limited in time, place, and scope."

Id. (citations omitted).

Arguably, the regulatory scheme here does limit the inspections in time, place, and scope. The rules provide that enforcement officers of the Department of Safety may inspect commercial motor carriers for safety "at any reasonable time" at an "inspection station" or "at a safe roadside location." Tenn. Comp. R. & Regs. ch. 1220-2-1-.23, -.46(4). Because of the nature of commercial vehicles, which travel the highways of this state twenty-four hours a day, any time of day or night is a "reasonable time" to ensure that the vehicles are operating safely. Dominguez-Prieto, 923 F.2d at 470. Also, allowing inspections at an "inspection station" or "at a safe roadside location" seems to permit an inspection at virtually any location so long as it is not private property, but commercial vehicles travel all of the public roads in this state and need to be operated safely on those roads. Thus, enforcement officers should be able to inspect those vehicles for safety wherever they travel. As for scope, the rules limit the inspection to "safety." Officer Feathers testified that the enforcement officers enforce the safety regulations set forth in the Federal Motor Carrier Safety Regulations. Those regulations, which have been adopted by this state, do establish the safety standards for periodic inspections. See 49 C.F.R. 396.17, App. G. The regulations authorize searches pertaining only to safety issues. Therefore, the regulations do limit the scope of the search.[2]

---

[2]We note that the rules governing periodic safety inspections do not authorize the enforcement officers to search for illegal narcotics or other contraband. See 49 C.F.R. 396.17, App. G. The State asserts that even if an officer's subjective motivation for the "safety inspection" is to search for illegal drugs, that subjective motivation is irrelevant so long as the original seizure is justified under the administrative regulations. In so doing, the State relies upon Wren v. United States, 517 U.S. 806 (1996), which held that if a police officer has probable cause to believe that a violation of the traffic code has occurred, the seizure will be upheld even if the stop is a complete pretext for the officer's subjective motivations in making the stop. Id. at 813-17. Based on our decision today, we need not address this issue. However,

(continued...)

Of principal concern, however, is that the regulations allow safety inspections to be conducted totally at the discretion of the officer in the field. Therefore, we do not believe that the regulatory scheme is "'sufficiently comprehensive and defined that the owner . . . cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'" Burger, 482 U.S. at 702 (quoting Dewey, 452 U.S. at 600). In applying the pervasively regulated business doctrine, the Supreme Court has stated that "warrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials." Dewey, 452 U.S. at 599. In Marshall v. Barlow's, Inc., the Supreme Court held that absent consent, a warrant was constitutionally required in order to conduct administrative inspections under the Occupational Safety and Health Act (OSHA) of 1970. Barlow's, 436 U.S. at 311. The statute at issue failed to tailor the scope and frequency of inspections to the particular health and safety concerns posed by the varied businesses regulated by the statute; instead, it flatly authorized administrative inspections of any establishment, area, work place or environment "where work is performed by an employee of an employer," and it provided that inspections could be performed "at . . . reasonable times, and within reasonable limits and in a reasonable manner." See id. at 323 n.21; Dewey, 452 U.S. at 601. Essentially, the Court found that the regulatory scheme "devolve[d] almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." See Barlow's, 436 U.S. at 323; Dewey, 452 U.S. at 601. The Court thus concluded that "a warrant was constitutionally required to assure a nonconsenting owner, who may have little real expectation that his business will be subject to inspection, that the contemplated search was 'authorized by statute, and . . . pursuant to an administrative plan containing specific neutral criterial.'" Dewey, 452 U.S. at 601 (quoting and interpreting Barlow's, 436 U.S. at 323).

In Donovan v. Dewey, the Supreme Court upheld warrantless searches of underground and surface mines pursuant to the pervasively regulated business doctrine. See 452 U.S. at 596. The statute at issue provided that all underground mines would be inspected at least four times per year and all surface mines would be inspected at least twice a year to insure compliance with the regulatory safety standards; followup inspections would be made to determine if previously discovered violations had been corrected. Id. The Supreme Court determined that the regulatory statute provided a constitutionally adequate substitute for a warrant in terms of the certainty and regularity of its application, noting that the statute required inspection of all mines and specifically defined the frequency of inspection. Id. at 603-04. The Court maintained,

Under these circumstances, it is difficult to see what additional protection a warrant requirement would provide. The Act itself clearly notifies the operator that inspections will be performed on a regular basis. Moreover, the Act and the regulations issued pursuant to it inform the operator of what health and safety

---

[2](...continued)

we do note that the Supreme Court in Wren briefly addressed the concept of pretext in administrative inspections, stating that its prior cases "simply explain that the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of . . . administrative regulation, is not accorded to searches that are not made for those purposes." Id. at 811-12.

standards must be met in order to be in compliance with the statute. <u>The discretion of Government officials to determine what facilities to search and what violations to search for is thus directly curtailed by the regulatory scheme</u>.

<u>Id.</u> at 605 (emphasis added).

Limiting the discretion of officers in the field as to who and when to search or seize has been a continuing theme in Fourth Amendment jurisprudence. Albeit in a different context, the Supreme Court, in addressing seizures without any individualized suspicion of wrongdoing, has stated, "The reasonableness of seizures that are less intrusive than a traditional arrest . . . depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'" <u>Brown v. Texas</u>, 443 U.S. 47, 50 (1979) (citations omitted). The Court went on the explain that

> [c]onsideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

<u>Id.</u> at 50-51. A key concern in balancing these interests in a variety of settings is to

> assure that an individual's reasonable expectation of privacy is <u>not subject to arbitrary invasions solely at the unfettered discretion of officers in the field</u>. To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that <u>the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers</u>.

<u>Id.</u> at 51 (citations omitted) (emphasis added). <u>See also</u> <u>Michigan v. Sitz</u>, 496 U.S. 444, 451-55 (1990) (upholding highway sobriety checkpoint where the checkpoint operation minimized the discretion of the officers on the scene); <u>Delaware v. Prouse</u>, 440 U.S. 648, 663 (1979) (holding that randomly seizing an automobile to check for driver's license and registration without any suspicion of wrongdoing is unreasonable under the Fourth Amendment); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 884 (1975) (holding that officers on roving patrol may only stop vehicles to search for illegal aliens if they have reasonable suspicion to believe that the vehicle contains illegal aliens; random, suspicionless seizures are unreasonable).

In the case before us, Officer Rollins and Officer Feathers both testified that the officers in the field have complete discretion to decide which vehicles to inspect. They are not given any guidance by the rules or by superior officers. Officer Feathers testified that an officer may make the decision to perform a safety inspection if the officer "feels like" the vehicle needs inspecting for "whatever reason." Officer Rollins testified that their decisions may be based on such considerations as the number of enforcement officers working and the volume of trucks coming through the scales, but often they are based not on a desire to ensure compliance with safety regulations but are instead based on a desire to search for possession of illegal drugs. Essentially, the decision of whom to seize

-13-

and when to seize is an arbitrary decision left to the "unfettered discretion of officers in the field." Brown, 443 U.S. at 51. Certainly, the decision to seize is not made "pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Id. Because the decision to perform a safety inspection is so arbitrary and unpredictable, we do not believe that a commercial motor carrier owner or operator could have any real expectation that his or her vehicle would be subject to periodic inspection. See Dewey, 452 U.S. at 601.

Accordingly, we hold that the regulatory scheme at issue in this case does not satisfy the third requirement of Burger: It is not a constitutionally adequate substitute for a warrant in terms of the certainty and regularity of its application. See Burger, 482 U.S. at 703; Dewey, 452 U.S. at 603. The seizure was the result of the exercise of unfettered discretion by the seizing officer to search for drugs or other contraband in the vehicle. Therefore, the Defendant's commercial vehicle was seized in violation of the Fourth Amendment's protections against unreasonable searches and seizures, and the trial court did not abuse its discretion by granting the Defendant's motion to suppress.

The order of the trial court suppressing the evidence against the Defendant is affirmed.

_____
DAVID H. WELLES, JUDGE