A04A1856. PONCE v. THE STATE.
(609 SE2d 736)

PHIPPS, Judge.

Hector Ponce was charged with trafficking in cocaine after police found more than 400 grams of it hidden in a load of watermelons in his tractor-trailer. Ponce moved to suppress the cocaine, arguing that

---

[4] See, e.g., *Sprayberry v. Dougherty County*, 273 Ga. 503, 504 (2) (543 SE2d 29) (2001).

it had been discovered during an illegal stop and search of his vehicle. The trial court heard the motion in conjunction with a bench trial, denied the motion, and found Ponce guilty as charged. He appeals, and we reverse because the stop violated his Fourth Amendment rights.

In reviewing a trial court's ruling on a motion to suppress, we construe the evidence most favorably to uphold the court's judgment, and we accept the court's factual findings and credibility determinations unless they are clearly erroneous.[1] We review de novo the court's application of the law to undisputed facts.[2]

Viewed in a light favorable to the trial court's ruling, the record shows the following facts. Captain Dan Jones of the Georgia Department of Motor Vehicle Safety (DMVS) authorized a safety checkpoint to inspect commercial vehicles headed north on Interstate 85 near Martin Bridge Road in Banks County. The Department of Transportation placed two large, lighted signs approximately one mile before the checkpoint that read, "Police checkpoint ahead, be prepared to stop." Police officers were stationed on both sides of the interstate near the exit, but the interstate was not blocked, and commercial vehicles were free to continue along the road unless a police officer signaled them to stop. Additional officers were stationed at the Martin Bridge Road exit ramp, according to Jones, to catch drivers who "[got] off the ramp trying to avoid being stopped." Although Jones testified that all commercial vehicles that passed the checkpoint were stopped, other officers participating in the safety check suggested that only some were stopped.

Corporal Rodney Waller of the DMVS testified that he was parked in the interstate's median near the exit ramp when Ponce's vehicle passed by. According to Waller, Ponce

> appeared to want to exit off there at Martin Bridge Road but instead of exiting off, he continued down, up interstate 85. . . . He looked slightly as he passed me. He looked over to his left, caught a glimpse of me and immediately [his] head went forward, straight forward. And the exit was coming up and his vehicle slowed to appear like he was fixing to exit off there at Martin Bridge Road.

When Ponce did not exit, Waller initiated a traffic stop.

The stop was recorded by a video camera in Waller's patrol car, and the resulting videotape was played for the court and admitted in

---

[1] *State v. Mallard*, 246 Ga. App. 357 (541 SE2d 46) (2000).
[2] Id.

evidence. The videotape shows that after Ponce exited his truck, Waller greeted him and asked for his driver's license, medical card, and logbook. Ponce gave Waller his logbook, but explained that he did not have a driver's license or medical card because his truck had been robbed the previous week.

While Waller was questioning Ponce about the robbery, Trooper Dallas Van Scoten of the Georgia State Patrol arrived. After conferring with Waller and questioning Ponce, Van Scoten sought and obtained permission to search the truck. Van Scoten found cocaine inside the trailer and Ponce was arrested.

After trial, the court made findings of fact from the bench. The court found that the DMVS decided to conduct a "massive safety inspection" along Interstate 85 and that "a number of commercial vehicles along with some private vehicles were stopped by [the officers] who were primarily emphasizing their attention to traffic going north." The court made no finding, however, that *all* north-bound commercial vehicles passing the checkpoint area were stopped, or that the DMVS intended to stop all such vehicles. The court further found that Ponce's driving behavior, while not sufficiently suspicious to constitute "reasonable articulable suspicion under *Terry*, . . . did indicate to [Waller] at least an inclination by [Ponce] to attempt to avoid a safety inspection." The court found that the initial stop was justified, but did not explicitly say why.[3] Finally, the court found that the officers were entitled to detain Ponce long enough to seek his consent to search, based on what Waller learned as the stop progressed, and that Ponce consented without coercion.

1. The state seeks to justify the stop because it was part of a lawful roadblock. Ponce argues, however, that the safety inspection did not meet the minimum constitutional requirements for a reasonable roadblock. We agree.

In order to be lawful, a roadblock must — among other things — stop all vehicles that pass by, as opposed to randomly stopping vehicles.[4] The trial court did not find that the safety checkpoint stopped all commercial vehicles, and the record does not support such a finding. In fact, Waller's testimony established that he singled out Ponce because Ponce's driving aroused his suspicions; he did not stop him simply because he drove a commercial vehicle past a safety checkpoint. Waller testified that his role at the safety checkpoint was

---

[3] The court stated, however, that "so long as the initial purpose [of the stop of a commercial vehicle] is . . . determining compliance with laws, rules and regulations that pertain to motor vehicles, that stop can be made without the equivalent reasonable articulable suspicion that would apply in the case of a private citizen or even in the case of a passenger on a commercial vehicle."

[4] *Baker v. State*, 252 Ga. App. 695, 696 (1) (556 SE2d 892) (2001).

to "patrol the interstate looking for trucks with safety violations" and that he was not told how often to stop vehicles or which criteria to look for. Thus, Waller never planned to stop *every* commercial vehicle, and he used his apparently unfettered discretion in determining which vehicles to stop. A roadblock at which an officer retains unfettered discretion to decide which vehicles to stop is not reasonable under the Fourth Amendment.[5]

2. Having established that Ponce was not stopped pursuant to a valid roadblock, we turn to whether Waller needed a reasonable, articulable suspicion of criminal activity to stop him. The state argues that the police may stop a commercial vehicle for a safety check without a reasonable, articulable suspicion of criminal activity; Ponce contends that such stops violate the Fourth Amendment. This is an issue of first impression in Georgia.

In *Delaware v. Prouse*,[6] the United States Supreme Court applied the principles of *Terry v. Ohio*[7] to noncommercial vehicles and held that the Fourth Amendment prohibits the police from stopping an automobile and detaining the driver unless they have a reasonable, articulable suspicion that the driver is violating the law.[8] The Court noted that its holding did not "cast doubt on the permissibility of roadside truck weigh-stations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others."[9] The Court did not, however, address the constitutionality of random safety checks of commercial vehicles.

In *New York v. Burger*,[10] the Supreme Court noted that although the Fourth Amendment applies to searches and seizures of commercial premises, as well as to private homes or vehicles, an owner or operator of a business has a reduced expectation of privacy in commercial property, particularly when that property is used in a closely regulated industry.[11] In fact, "[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise."[12] Accordingly, the Court held that a warrantless inspection of a business operating in a closely regulated industry does not violate the Fourth Amendment if (1) there is a "substantial government

---

[5] See *State v. Manos*, 237 Ga. App. 699, 700 (516 SE2d 548) (1999).

[6] 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979).

[7] 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968).

[8] *Delaware v. Prouse*, supra at 663.

[9] Id. at 663, n. 26.

[10] 482 U. S. 691 (107 SC 2636, 96 LE2d 601) (1987).

[11] Id. at 699.

[12] (Citations and punctuation omitted.) Id.

interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) the warrantless inspection is "necessary to further the regulatory scheme"; and (3) "the statute's inspection program, in terms of certainty and regularity of its application, [provides] a constitutionally adequate substitute for a warrant."[13]

The *Burger* test, rather than the *Delaware v. Prouse* analysis, has been widely applied to inspections of commercial vehicles due to the extensive federal and state regulation of the motor carrier industry.[14] In *United States v. Fort*,[15] for example, the United States Court of Appeals for the Fifth Circuit applied the *Burger* test and upheld a warrantless routine safety inspection of a commercial truck in Texas. The court concluded that commercial trucking was a closely regulated industry in Texas, that Texas had a substantial governmental interest in the safety of commercial trucks, that warrantless inspections were necessary to further that interest, and that the state statutory scheme under which the inspection was conducted provided drivers with adequate notice of possible inspections and limited the discretion of the inspecting officers.

We agree with *Fort* and other courts that the *Burger* analysis applies to warrantless inspections of commercial vehicles because commercial trucking is a closely regulated industry. We find, however, that the *Burger* criteria were not satisfied here.

We assume, without deciding, that the state has a substantial interest in regulating the commercial trucking industry and that warrantless searches are necessary to further that interest. Turning to the third *Burger* criterion, however, we cannot conclude that the inspection program authorized under the Georgia laws cited by the state, in terms of the certainty and regularity of its application, provides a constitutionally adequate substitute for a warrant.

The *Burger* Court explained the third criterion as follows:

> [T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic

---

[13] (Citations and punctuation omitted.) Id. at 702-703.

[14] See, e.g., *United States v. Fort*, 248 F3d 475 (5th Cir. 2001); *State v. McClure*, 74 SW3d 362 (Tenn. Crim. App. 2001); *State v. Landrum*, 739 NE2d 1159 (Ohio App. 2000); *McCauley v. Commonwealth*, 435 SE2d 891 (Va. App. 1993), aff'd on reh'g, 443 SE2d 164 (Va. App. 1994).

[15] Supra.

inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.[16]

The statute at issue in *Burger*, which authorized the inspection of vehicle-dismantling businesses, was sufficiently definite and limited. It specified which business records and vehicles could be inspected and provided that inspections could occur only during regular business hours. The statute at issue in *Fort*,[17] which permitted inspections of commercial vehicles, also provided a constitutionally adequate substitute for a warrant. It specified when, where, and for what purpose inspections could be made, and it set forth a procedure for officers to follow in conducting inspections.[18]

The Georgia statutes cited by the state, on the other hand, do not provide a constitutionally adequate substitute for a warrant. OCGA § 46-7-2 authorizes the commissioner of public safety "to regulate the business of any person engaged in the transportation as a common or contract carrier of persons or property, either or both, for hire by motor vehicle on any public highway of this state." Other statutes permit the commissioner to promulgate rules and regulations for the safe operation of motor carriers.[19] The state, however, has not included in the record any rules and regulations that may have been promulgated by the commissioner regarding inspections of commercial vehicles.[20]

The state does cite two statutes concerning inspections, but neither one establishes an inspection procedure that would substitute for a warrant requirement. OCGA § 40-8-7 (d) provides that any vehicle "suspected of being operated in violation of this article may be the subject of an inspection conducted by any law enforcement officer who has reason to believe such violation is occurring." This statute authorizes inspections only on the basis of a suspected safety violation, not at random. OCGA § 40-16-2 (b) (3) provides that the DMVS, in enforcing laws and regulations related to motor carriers, shall

---

[16] (Citations and punctuation omitted.) *Burger*, supra at 703.

[17] Supra.

[18] See *United States v. Fort*, 81 FSupp.2d 694, 699, n. 11 (N.D. Tex. 2000).

[19] See OCGA §§ 46-7-27; 40-8-2.

[20] See generally *Lemon v. Martin*, 232 Ga. App. 579, 581-582 (1) (502 SE2d 273) (1998) (rules and regulations of a state agency cannot be judicially noticed, but must instead be pled and proved), rev'd on other grounds, *Martin v. Johnson-Lemon*, 271 Ga. 120 (516 SE2d 66) (1999).

> [h]ave the power to stop, enter upon, and inspect all motor vehicles using the public highways for purposes of determining whether such vehicles have complied with and are complying with this chapter and other laws the administration or enforcement of which is the responsibility of the department.

This statute, however, contains no guidelines concerning inspection procedures and fails to constrain in any way the discretion of DMVS officers to conduct inspections. Thus, it does not satisfy the third *Burger* criterion.

In sum, warrantless searches of commercial vehicles may be constitutionally authorized by a state statutory or regulatory scheme that meets the criteria of *Burger*, including the requirement that the scheme "in terms of certainty and regularity of its application, [provides] a constitutionally adequate substitute for a warrant." The Georgia statutes cited by the state, however, do not meet this requirement.

3. Because the Georgia statutes purporting to authorize warrantless administrative inspections of commercial vehicles are not sufficiently definite, Waller's stop of Ponce can be justified only if Waller had a reasonable, articulable suspicion that Ponce was engaged in criminal activity. The state argues that Ponce acted evasively as he approached the inspection site, giving Waller a reasonable suspicion that he was engaged in criminal activity, but we disagree.

"An officer may conduct a brief investigative stop of a vehicle if the stop is justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[21]

> And, while normal driving that incidentally evades a roadblock does not justify an investigative stop, abnormal or unusual actions taken to avoid a roadblock may give an officer a reasonable suspicion of criminal activity even when the evasive action is not illegal.[22]

When an officer stops a driver based upon abnormal or unusual actions taken to evade a roadblock, the legality of the roadblock itself

---

[21] (Punctuation omitted.) *Jones v. State*, 259 Ga. App. 506, 507 (1) (578 SE2d 165) (2003), citing *Terry v. Ohio*, 392 U. S. 1, 21 (88 SC 1868, 20 LE2d 889) (1968).

[22] (Citations and punctuation omitted.) *Jones*, supra at 507.

is not relevant.[23]

Waller testified that as Ponce's truck passed his patrol car, Ponce looked at him, looked away quickly, slowed before the Martin Bridge Road exit, then continued past the exit. Based on this testimony, the trial court found that Ponce's behavior "did indicate to [Waller] at least an inclination by the driver to avoid a safety inspection." The court did not find, however, that Ponce had attempted to evade the roadblock, and the record does not support such a finding. Although he may have broken eye contact with a police officer and slowed down before the safety inspection point, he drove toward the inspection site and submitted to the inspection. Thus, he did not engage in any evasive driving maneuvers providing independent justification for a traffic stop.[24]

In the absence of a reasonable, articulable suspicion of criminal behavior, Waller had no basis for stopping Ponce. Accordingly, the fruits of that stop — the cocaine found in the truck — should have been suppressed.

*Judgment reversed. Johnson, P. J., and Smith, P. J., concur.*

DECIDED JANUARY 26, 2005 — 

*Jennifer S. Hanson, Bruce S. Harvey, David W. Martin, Kimberly A. Dymecki*, for appellant.

*Timothy G. Madison, District Attorney, Tamara Nowlin, Robin R. Riggs, Assistant District Attorneys*, for appellee.

---

[23] See *Gary v. State*, 268 Ga. App. 773, 776 (2) (603 SE2d 304) (2004) (physical precedent only).

[24] Compare, e.g., *Taylor v. State*, 249 Ga. App. 733, 735 (549 SE2d 536) (2001) (police officer had reasonable suspicion to stop driver who turned shortly before roadblock and drove into parking lot of closed business).