### A11A1158. TUNALI v. THE STATE.
(717 SE2d 341)

DOYLE, Judge.

This appeal arises from this Court's grant of Rauf Tunali's application for interlocutory review of the denial of his motion to suppress evidence obtained during a traffic stop. Tunali contends that the trial court erred because (1) the State failed to demonstrate the basis for the investigating officer's suspicion justifying the initial traffic stop, and (2) the investigating officer administered an alco-sensor test without first giving Tunali an implied consent warning. For the reasons that follow, we affirm.

While the trial court's findings as to disputed facts in a ruling on a motion to suppress will be reviewed to determine whether the ruling was clearly erroneous, where the evidence is uncontroverted and no question regarding the

---

credibility of witnesses is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review.[1]

Here, the relevant evidence is undisputed, and we therefore review the trial court's legal rulings de novo.

The record shows that Tunali was driving on an interstate highway in a Ford F250 pickup truck, which displayed a hazardous materials placard.[2] An officer from the Department of Public Safety ("DPS") stationed at a commercial vehicle weighing and inspection station observed Tunali drive past the station without stopping. Based on Tunali's failure to stop, the officer pursued him and conducted a traffic stop. As the officer spoke with Tunali and directed him back to the inspection station, he noticed an odor of alcohol on Tunali's breath. When the officer asked Tunali if he had consumed any alcohol, Tunali said that he had done so eight hours before the officer stopped him. The officer asked Tunali if he would blow into an alco-sensor to detect the presence of alcohol. Tunali consented and blew into the sensor, which registered positive for alcohol.

The officer allowed Tunali's passenger, who was properly licensed, to drive the vehicle to the inspection station where the officer performed an inspection of the vehicle for compliance with commercial vehicle standards. Based on his encounter with Tunali, the officer issued him citations for DPS rules violations based on exhibiting a detectable level of alcohol while driving a commercial vehicle and having a broken rear brake light/turn signal that the officer noticed after he executed the traffic stop.

The State returned an accusation alleging that Tunali drove a commercial vehicle with a detectable presence of alcohol about his person and operated a commercial vehicle without functioning lights. Tunali moved to suppress any evidence from the traffic stop, and following an evidentiary hearing, the trial court denied the motion and certified the ruling for immediate review. This Court then granted Tunali's application for interlocutory review.

1. Tunali contends that the trial court erred by ruling that the initial traffic stop was justified by a reasonable articulable suspicion of criminal activity, arguing that the DPS rules are not subject to judicial notice and the State failed to introduce the DPS rules giving rise to the suspected violation justifying the traffic stop. We disagree.

In the context of a motion to suppress, the State bears the burden of proving that the traffic stop and subsequent search or

---

[1] (Citations omitted.) *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

[2] Tunali's vehicle did not actually contain any hazardous materials.

seizure of evidence were lawful.[3] Thus, the State must demonstrate the legal basis for the officer's authority to stop the vehicle.[4] Tunali correctly points out that the DPS rules relied upon by the officer and the State have not been made a part of the record, and historically, certain rules were not subject to judicial notice because they were not promulgated pursuant to the Georgia Administrative Procedure Act ("APA").[5] Thus, Tunali argues that the State cannot meet its burden because it cannot show the basis for the officer's traffic stop.[6]

Nevertheless, the Georgia Public Service Commission has formally adopted motor carrier safety regulations issued by the Federal Motor Carrier Safety Administration, as codified in the Rules and Regulations of the State of Georgia, which is the official compilation made by the Georgia Secretary of State under the APA.[7] Under these rules, certain officers of DPS, such as the officer in this case, are authorized to stop commercial vehicles to conduct safety inspections under Georgia's regulations.[8] The traffic stop in this case occurred after the formal adoption of the federal rules; thus we take judicial notice of the rules as adopted.[9]

In light of the authority of the officer to stop and inspect commercial vehicles,[10] and in light of the evidence that Tunali drove

---

[3] See *Lucas v. State*, 284 Ga. App. 450, 451 (644 SE2d 302) (2007); *Teal v. State*, 291 Ga. App. 488, 489 (662 SE2d 268) (2008).

[4] See, e.g., *Hines v. State*, 214 Ga. App. 476, 477 (448 SE2d 226) (1994) ("It is evident that the stop of a vehicle is authorized if an officer observes the commission of a traffic offense.").

[5] See *Ponce v. State*, 279 Ga. App. 207, 210 (2) (630 SE2d 840) (2006) ("Because the [Public Service Commission's] transportation rules were not promulgated in accordance with the APA, we cannot judicially notice them.").

[6] See, e.g., *Lucas*, 284 Ga. App. at 451 (State could not rely on unproven city ordinance to demonstrate basis for officer's reasonable articulable suspicion).

[7] See *Taylor v. State*, 305 Ga. App. 748, 749, n. 1 (700 SE2d 841) (2010) ("The Georgia [DPS] is charged with enforcing federal motor carrier regulations, which have been adopted under Georgia law, and officers of the department have authority to stop commercial vehicles for safety inspections."); *Solano-Rodriguez v. State*, 295 Ga. App. 896, n. 2 (673 SE2d 351) (2009). See also Ga. Comp. R. & Regs. r. 515-16-4-.01; *Ponce*, 279 Ga. App. at 208-210 (2) (describing publication of rules by the Secretary of State under the APA).

[8] See *Taylor*, 305 Ga. App. at 749, n. 1; *Solano-Rodriguez*, 295 Ga. App. at 897, n. 3; see also Ga. Comp. R. & Regs. r. 570-31-.01 ("[DPS] Employees designated as Law Enforcement Officers of the Motor Carrier Compliance Division of the Department of Public Safety, shall have the authority to carry firearms, to make arrests, to stop and enter motor vehicles . . .").

[9] See *Solano-Rodriguez*, 295 Ga. App. at 896, n. 2. Although not applicable here, we further note that, as of July 1, 2011, DPS has adopted a transportation rulebook, made available on its Internet site, stating that DPS officers "[h]ave the power to stop, enter upon, and inspect all motor vehicles using the public highways for purposes of determining whether such vehicles have complied with and are complying with laws, the administration or enforcement of which is the responsibility of the department." DPS Transportation Rulebook, R. 1-5 (a) (3). See also OCGA § 40-1-23 (w) (2) (effective July 1, 2011, as noted in Ga. L. 2011, p. 479, § 26).

[10] Tunali did not argue in the trial court or in this Court that the officer's inspection authority itself violated the Fourth Amendment, and we do not address that issue. See generally *New York v. Burger*, 482 U. S. 691, 699-712 (II)-(III) (107 SC 2636, 96 LE2d 601)

a truck displaying a hazardous material placard as he failed to stop at an established interstate vehicle inspection station, we find no error in the trial court's conclusion that the State met its burden to demonstrate the officer's authority to conduct the traffic stop.[11]

2. Tunali also challenges the admissibility of the breath test administered by the officer because the officer did not read him the implied consent warning. Nevertheless, the record shows that the breath test administered was an alco-sensor test designed to test for the presence of alcohol. That result, the presence vel non of alcohol, was the only evidence tendered at the hearing, and no blood alcohol concentration was at issue. OCGA § 40-5-153 (c) applies to commercial drivers and requires that an implied consent warning be given to drivers of commercial vehicles when an officer administers a test to determine the person's "alcohol *concentration* or the presence of other drugs."[12] Thus, as this Court has held when analyzing the admissibility of testing of noncommercial drivers under OCGA § 40-6-392, which is explicitly referenced in OCGA § 40-5-153 (a), the implied consent warning requirement does not apply to alco-sensor tests, which merely detect the presence, not concentration, of alcohol.[13] This is consistent with the plain meaning of the phrase "alcohol *concentration* or the *presence* of other drugs."[14] Had the legislature intended to require the implied consent warning for tests detecting only the presence — and not concentration — of alcohol, it could have used the phrase "presence of alcohol," as it expressly did for drugs. Therefore, the officer was not required to give the implied consent warning under OCGA § 40-5-153, and this enumeration affords no basis for reversal.

*Judgment affirmed. Ellington, C. J., and Miller, P. J., concur.*

DECIDED OCTOBER 4, 2011.

*Allen M. Trapp, Jr.*, for appellant.

---

(1987) (addressing the Fourth Amendment implications of regulatory inspection programs).

[11] Cf. *Ponce v. State*, 271 Ga. App. 408, 414 (3) (609 SE2d 736) (2005) (unusual avoidance of a police roadblock may give rise to a reasonable suspicion of criminal activity), vacated on other grounds, *State v. Ponce*, 279 Ga. 651 (619 SE2d 682) (2005).

[12] (Emphasis supplied.)

[13] See *Keenan v. State*, 263 Ga. 569, 571 (2) (436 SE2d 475) (1993) (no requirement to give implied consent warning for alco-sensor test); *Turrentine v. State*, 176 Ga. App. 145, 146 (1) (335 SE2d 630) (1985) (same).

[14] See *Currid v. DeKalb State Court Probation Dept.*, 285 Ga. 184, 187 (674 SE2d 894) (2009) ("'[W]e apply the fundamental rules of statutory construction that require us to construe the statute according to its terms, to give words their plain and ordinary meaning, and to avoid a construction that makes some language mere surplusage.") (punctuation omitted).

*Nina M. Baker, Solicitor-General, Julian A. Mack, Assistant Solicitor-General*, for appellee.