# United States Court of Appeals
## For the First Circuit

No. 03-1739

UNITED STATES OF AMERICA,

Appellee,

v.

LAWRENCE E. MALDONADO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]
[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

Nicholas J.K. Mahoney on brief for appellant.
Paula D. Silsby, United States Attorney, and Margaret D. McGaughey, Appellate Chief, on brief for appellee.

January 20, 2004

**SELYA**, **Circuit Judge**.  This appeal requires us to decide whether interstate commercial trucking is a pervasively regulated industry, and if so, whether the regulatory scheme applicable to that industry comes within the purview of the administrative search exception to the Fourth Amendment's warrant requirement.  These are questions of first impression in this circuit.  We answer both of them affirmatively — and those answers lead us to affirm the judgment below.

## I.  BACKGROUND

Although the parties draw different inferences from them, the relevant facts are largely undisputed.  During the afternoon of August 8, 2002, a Maine state trooper, Robert Flint, Jr., was patrolling the Maine Turnpike.  While in Wells, he noticed a northbound moving van that bore the legend "Allied Van Lines."  The truck appeared to be exceeding the posted speed limit (50 m.p.h.) and Flint's radar, freshly calibrated, recorded its speed at 66 m.p.h.  A second reading showed a slightly reduced speed (63 m.p.h.), consistent with the driver having spotted the trooper.

Flint chased the moving van and pulled it over for speeding.  As he walked up to the cab, he noticed that the driver, defendant-appellant Lawrence E. Maldonado, was not wearing a seat belt.  Flint asked Maldonado for his driver's license, his medical certificate (a document that is obligatory for all interstate truckers), and the truck's registration.  Maldonado produced a New

-2-

Mexico license, a medical certificate, and a Texas registration. Although the license and medical certificate both noted a need for corrective eyeware, Maldonado was driving without either spectacles or contact lenses. Upon inquiry, he informed Flint that he had left his broken glasses in a motel room in Connecticut.

Maldonado mentioned that he was transporting a shipment of household goods from Alabama to Maine. Because Flint knew that federal regulations required truckers to keep log books for trips of that length, he asked to see Maldonado's log book. The last entry had been made at 11 a.m. on August 7 (more than 24 hours earlier). Flint instructed Maldonado to update the log book. He then returned to his cruiser to check on Maldonado's license. Word came back that the license had been suspended.

Flint was concerned because Maldonado had breached several federal trucking regulations (e.g., he had failed to keep his log book current, 49 C.F.R. § 395.8; failed to wear a seat belt, id. § 392.16; and operated the truck without a valid license, id. § 391.15). For that reason, Flint summoned a fellow trooper, Robert Nichols. Nichols is one of a handful of members of the Maine State Police who specialize in enforcing commercial trucking regulations. Those troopers serve in dual capacities as agents of the Federal Motor Carrier Safety Administration (FMCSA) and members of the state police. As such, they are "authorized to enter upon, to inspect, and to examine any and all . . . equipment of motor

carriers . . . ." 49 C.F.R. Ch. III, Subch. B, App. B(1). Only FMCSA agents (including dual-capacity agents) carry the forms that appertain to commercial trucking violations.

Flint also summoned a tow truck because he realized that Maldonado would not be allowed to drive with a suspended license. That was the end of Flint's initiatives; Nichols arrived at the scene about an hour after the initial stop and Flint immediately surrendered control of the investigation (he had not arrested Maldonado, nor did he plan to do so). The tow truck had not yet responded.

Flint briefed Nichols about the situation and the officers walked to the cab of the moving van. Nichols asked Maldonado for the truck's operating authority (a document that cedes the right to operate a commercial vehicle in Maine). Maldonado did not have any such paperwork. Nichols then requested Maldonado's fuel and toll receipts. Maldonado had no receipts for fuel and only three toll receipts (from Massachusetts, New Hampshire, and Maine, respectively). Nichols viewed this as suspicious because, in his experience, commercial truckers undertaking long cross-country hauls typically have "a pile" of such receipts and he expected to see, at a bare minimum, additional toll receipts from New Jersey and New York.

Nichols next requested Maldonado's shipping papers (he testified that most moving vans carrying household goods take along

-4-

what amounts to an inventory of the cargo). Maldonado had no papers; he claimed to have left them in his motel room. On further inquiry, however, he could not name the motel, pinpoint its location, or produce a room key.

Having grown increasingly suspicious, Nichols asked Maldonado to step out of the vehicle. He searched the cab area, knowing that the truck was destined to be towed. He was surprised to find neither luggage nor extra clothing (he did, however, find a machete).

As Flint was preparing to leave, Nichols asked him if he thought that the expiration date on the moving van's registration had been altered. The troopers agreed that it looked suspicious. At that point, Nichols called in a canine drug search unit. While this unit was en route, Flint departed. Nichols proceeded to run the license plate. This check revealed that the truck's registration had in fact expired.

Nichols then asked Maldonado to unlock the trailer. Maldonado opened the doors of the unlocked storage compartments but did not have keys to unlock the sealed units. He asked Nichols for bolt cutters but Nichols had none. By that time, the tow truck had arrived, and the driver proffered his bolt cutters. Maldonado cut the padlocks.

When the doors to the van were opened, Nichols noticed an upside-down couch and a pile of boxes. He testified that, by this

time, he suspected that drugs were being transported and that the goods in plain view comprised a "cover load." Nichols entered the van. As he tried to maneuver toward the front, he had to move a number of boxes in order to clear a path. Although the boxes were marked with room destinations and the name "Baily," they were empty.

Upon reaching the front of the trailer, Nichols kicked another box, thinking that it too would be empty. The box did not budge. Nichols opened it and saw what appeared to be marijuana. By then, the canine unit had arrived and the drug dog responded positively to the opened box.

The denouement followed: Nichols stepped out of the trailer, arrested Maldonado, and placed him in handcuffs. The van was towed to a holding facility and Maldonado was taken to jail. A subsequent search of the truck, conducted pursuant to a warrant, revealed no additional contraband.

A federal grand jury sitting in the District of Maine charged Maldonado with possession with intent to distribute 50 or more kilograms of marijuana. See 21 U.S.C. § 841(a)(1), (b)(1)(C). Maldonado's motion to suppress was denied after an evidentiary hearing. See United States v. Maldonado, No. 02-85, 2002 WL 31444563 (D. Me. Nov. 1, 2002).[1] In due course, Maldonado entered

---

[1]The district judge referred the suppression motion to a magistrate judge. See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). On de novo review, he thereafter accepted and adopted the

a conditional guilty plea, see Fed. R. Crim. P. 11(a)(2), reserving his right to seek review of the denial of his motion to suppress.

This appeal followed. Its scope is relatively narrow. In the lower court, Maldonado moved to suppress both the evidence seized and the statements he had made. In this venue, however, he focuses solely on the alleged illegality of the search. His earlier claims of Miranda violations, see Miranda v. Arizona, 384 U.S. 436, 444-45 (1966), are therefore waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## II. ANALYSIS

When reviewing a trial court's disposition of a motion to suppress on Fourth Amendment grounds, we accept the court's findings of fact unless clearly erroneous and evaluate its legal conclusions de novo. United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001); United States v. Sowers, 136 F.3d 24, 26 (1st Cir. 1998).

Maldonado wisely chooses not to question the legitimacy of the initial stop. He was driving in excess of the speed limit and this active violation of the law afforded an ample basis for Flint to halt the moving van. See Delaware v. Prouse, 440 U.S. 648, 659 (1979). Nor do Flint's ensuing actions provide any grist

---

magistrate judge's detailed report and recommendation. For simplicity's sake, we do not distinguish between the two judicial officers, but, rather, take an institutional view and refer to the determinations below as those of the district court.

for Maldonado's appellate mill. When a police officer stops a motorist for a traffic violation, the officer may ask the motorist to produce routine driving documents. See, e.g., id.; United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001). The question of which documents are routine (and, thus, can reasonably be requested) is context-specific. See United States v. Hornbecker, 316 F.3d 40, 47-48 (1st Cir. 2003); Chhien, 266 F.3d at 6. A driver's license and registration are plainly routine documents that the police may review in the course of any highway stop. Caro, 248 F.3d at 1244. In the case of a commercial trucker, a medical certificate and a log book fall into the same category — they are documents that the trucker is legally required to possess. See, e.g., 49 C.F.R. §§ 391.43, 395.8; Me. State Police, Motor Carrier Safety Rules ch. 4, § 2. Therefore, it was not unreasonable for Flint to request that Maldonado produce these documents.

In all events, Maldonado pays little attention to Flint's actions. Instead, he trains his sights on Nichols's warrantless search of the moving van and characterizes that search as a violation of the Fourth Amendment. This characterization misfires: Nichols's actions were valid under the administrative search exception to the warrant requirement.[2]

_____

[2]The fact that Nichols is a state trooper is unimportant to our analysis. For one thing, he was authorized to act as a federal agent. See supra pp. 3, 4. For another thing, the Maine State

-8-

Commerce, by its very nature, often results in a heightened governmental interest in regulation. This increased interest necessarily results in a diminution of the privacy interests of those who operate commercial premises. See New York v. Burger, 482 U.S. 691, 700 (1987). That trend crests when an industry operates under pervasive regulation. Id. In such circumstances, warrantless inspections of commercial sites may be constitutionally permissible. Id. at 702-03.

Under the Burger doctrine, such inspections must satisfy three criteria in order to pass Fourth Amendment muster. First, there must be a "substantial government interest that informs the regulatory scheme pursuant to which the inspection is made." Id. at 702. Second, inspections must be necessary to advance the regulatory agenda. Id. Finally, the inspection program must provide constitutionally adequate safeguards to ensure both the certainty and regularity of its application. Id. at 703. This last criterion looks to notice as to the scope of the search as well as limitations on the discretion afforded to inspecting officers. Id.

For purposes of the Burger doctrine, we see no meaningful distinction between commercial premises and commercial vehicles.

---

Police are authorized to adopt rules incorporating the federal administrative regulatory framework, see 49 C.F.R. § 350; Me. Rev. Stat. Ann. tit. 29, § 555(2), and Maine has done so, see Me. State Police, Motor Carrier Safety Rules ch. 4, § 2.

Consequently, the threshold question in this case is whether interstate commercial trucking is regulated to the extent necessary to give rise to the administrative search exception. We conclude that it is. After all, the interstate trucking industry is regulated extensively by both federal and state agencies. Federal regulations alone cover such things as drivers' qualifications, drivers' hours of service, inspection, repair and maintenance of trucks, vehicle parts and accessories, reporting of accidents, recording of itineraries, safe handling of cargo, transportation of hazardous materials, and a myriad of other issues. See 49 C.F.R. §§ 300-399. By like token, many states regulate the industry. See, e.g., Me. State Police, Motor Carrier Safety Rules, ch. 4; Kan. Stat. Ann. §§ 66-1302 to 66-1330, & 74-2108; Tenn. Code Ann. §§ 65-15-101 to 65-15-126. In light of this far-flung regulatory web, we join three of our sister circuits in holding that interstate commercial trucking is a pervasively regulated industry capable of supporting recourse to the administrative search exception. See United States v. Vasquez-Castillo, 258 F.3d 1207, 1210 (10th Cir. 2001); United States v. Fort, 248 F.3d 475, 480 (5th Cir. 2001); United States v. Dominquez-Prieto, 923 F.2d 464, 468 (6th Cir. 1991); see also United States v. V-1 Oil Co., 63 F.3d 909, 911 (9th Cir. 1995) (finding regulation under the Hazardous Materials Transportation Act pervasive); cf. California v. Carney, 471 U.S. 386, 392 (1985) (noting that private

-10-

automobiles carry a reduced expectation of privacy and are subject to heavy governmental regulation).

We next must determine whether the regulatory scheme surrounding this industry satisfies the tripartite Burger standard. As to the first criterion, it cannot be gainsaid that the government has a significant interest in regulating the interstate trucking industry (e.g., to ensure traveler safety, hold costs in check, and restrict what commodities may be transported interstate). See Fort, 248 F.3d at 480; Dominguez-Prieto, 923 F.2d at 468. Taken in the ensemble, these justifications comprise a set of legitimate and substantial interests.

As to the second criterion, we think it self-evident that warrantless inspections of commercial trucks are necessary to further the regulatory scheme. Because the industry is so mobile, surprise is an important component of an efficacious inspection regime. See United States v. Biswell, 406 U.S. 311, 316 (1972) (stating that "if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential"); V-1 Oil Co., 63 F.3d at 912 (similar). Fairly measured, the interests justifying warrantless searches in the interstate trucking industry are even greater than those present in Burger (which involved the regulation of junkyards) because of the speed with which commercial vehicles move from place to place. See Vasquez-Castillo, 258 F.3d at 1211; Fort, 248 F.3d at 481. And,

finally, because violations of the regulatory scheme often are not apparent to a patrolling officer, inspections are sometimes the only way in which violations can be discovered. We conclude, therefore, that effective enforcement of the regulatory regime would be impossible in the absence of impromptu inspections.

The regulatory scheme applicable to the interstate commercial trucking industry also satisfies the final Burger criterion. The carefully delineated scope of the federal regulations suitably cabins the discretion of the enforcing officer. Moreover, the regulations themselves give ample notice to interstate truckers that inspections will be made on a regular basis. To cinch matters, commercial drivers are required by law to be familiar with the applicable regulations, see 49 C.F.R. § 390.3(e)(2), and Maldonado concedes that he was aware that his vehicle could be searched "at the discretion of an inspecting officer." Appellant's Br. at 23.

Since all three of the Burger criteria are satisfied, it follows inexorably that an administrative search of a commercial truck is constitutionally permissible. Accord Vasquez-Castillo, 258 F.3d at 1212; Fort, 248 F.3d at 480-82. We so hold.

Maldonado makes two related attempts to circumvent the application of the administrative search exception. Both attempts hinge on his perception that Nichols was trolling for drugs, not for administrative violations. We discuss each argument in turn.

Maldonado's basic premise is that this particular search violates the second Burger criterion as it was not in furtherance of the regulatory scheme. That is so, he argues, because Nichols did not care a fig for regulatory violations, but, rather, intended all along to rummage for drugs. This argument reflects a misunderstanding of Supreme Court doctrine. The Burger criteria apply to a regulatory scheme generally, not to the particular search at issue. See Burger, 482 U.S. at 703 (finding searches made pursuant to a particular state regulatory statute within the administrative exception to the warrant requirement); id. at 703-12 (applying the three-part test to the scheme regulating vehicle dismantling as opposed to the specific search at issue). In other words, the Burger criteria are applied generally to a statutory scheme, not to a given set of facts arising under that scheme.

Alternatively, Maldonado argues that Nichols's actual intent in carrying out the search takes this case outside the boundaries of the administrative search exception and renders constitutionally infirm what otherwise might have been a permissible Burger search. The suggestion here is that even if the regulatory scheme satisfies the Burger criteria — and we have so held, see supra — this particular search is beyond the pale.

This construct has a patina of plausibility. In Whren v. United States, 517 U.S. 806 (1996), the Court suggested that the exemption from the warrant requirement afforded to an

-13-

administrative search only extends to searches actually made for administrative purposes.  See id. at 811-12.  Thus, the general rule of Whren — that the subjective intent of the officer plays no role in a Fourth Amendment analysis — arguably may not apply in this context.

We need not resolve this question definitively because the answer to it will in no way alter the outcome of the case.  Cf. Three Affiliated Tribes of Ft. Berthold Reserv'n v. Wold Eng'g, P.C., 467 U.S. 138, 157 (1984) (noting the "fundamental rule of judicial restraint" that courts ought not to "reach constitutional questions in advance of the necessity of deciding them").  The key is that Maldonado's argument concerning Nichols's subjective intent fails on the facts.

The district court found "no evidence that Nichols had any intent to search for drugs" when he examined the passenger compartment of the van (i.e., the cab).  Maldonado, 2002 WL 31444563, at *8 n.4.  This finding is amply supported by the record and is thus not clearly erroneous.  Only the search of the trailer, then, is susceptible to legitimate question — and when that search occurred there was sufficient probable cause to satisfy the automobile exception to the warrant requirement.  After all, Maldonado was driving a truck that had an expired and illegally altered registration; he had no valid driver's license; he could not produce an operating authority; he had told a tale that

bordered on the incredible (he had no shipping papers, no fuel receipts, an unrealistically tiny number of toll receipts, no way to identify the motel room that he supposedly occupied, no luggage or other overnight gear), and the trooper was aware that Maldonado had violated virtually every rule in the book. He also was aware that the truck contained what appeared to his experienced eye to be a "cover load."

These facts, taken in conjunction with Maldonado's implausible explanations, were sufficient to give rise to probable cause to believe that Maldonado was carrying contraband. See United States v. Lee, 317 F.3d 26, 32 (1st Cir. 2003) (explaining that "[p]robable cause often accretes gradually"). Thus, the search of the trailer was justified by the automobile exception to the warrant requirement. See Maryland v. Dyson, 527 U.S. 465, 467 (1999) (per curiam) (deciding that the automobile exception to the warrant requirement is satisfied if there is probable cause to believe a car contains contraband); Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam) (holding, with an exception not pertinent here, that if "probable cause exists to believe [a vehicle] contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more"); see also United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992) (explaining that the only "essential predicate" for a valid warrantless search of an

-15-

automobile is probable cause to believe that the vehicle contains contraband).

## III.  CONCLUSION

We need go no further.  Because we find the warrantless inspection of Maldonado's moving van consistent with the Fourth Amendment, we uphold the district court's denial of the motion to suppress.

**<u>Affirmed</u>**.