[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 12, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-13144

_____

D. C. Docket No. 07-00002-CR-WCO-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HECTOR MANUEL PONCE-ALDONA,
a.k.a. Hector Manuel Ponce-Aldana,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 12, 2009)

Before TJOFLAT, ANDERSON and STAPLETON,* Circuit Judges.

ANDERSON, Circuit Judge:

---

*Honorable Walter K. Stapleton, United States Circuit Judge for the Third Circuit, sitting by designation.

Hector Ponce Aldona appeals his convictions for conspiracy to possess with intent to distribute at least five kilograms of cocaine hydrochloride and possession with intent to distribute at least five kilograms of cocaine hydrochloride. Ponce entered a conditional plea of guilty to these charges, preserving the right to challenge on appeal the district court's denial of his motion to suppress. On appeal, Ponce argues that the district court erroneously found that the initial stop at issue did not violate the Fourth Amendment because it fell under the administrative search exception to the warrant requirement.

## I. FACTS AND PROCEDURAL HISTORY

On August 14, 2003, officers of the Georgia Department of Motor Vehicle Safety ("DMVS") set up a safety checkpoint at the Martin Bridge Road exit off of I-85 northbound. A number of officers were stationed on the exit ramp and several more were stationed on the medians and sides of I-85, watching traffic. Lighted signs posted at two miles and one mile from the checkpoint indicated "police checkpoint ahead, be prepared to stop." A patrol car was at the ramp with blue lights flashing to signal to drivers that they were to pull off for inspection. Captain Jones, the DMVS officer in charge, testified that if a commercial vehicle drove past without stopping for inspection, it was going to be stopped unless all of the officers were tied up. Ponce was driving a truck northbound on I-85 when one of the

2

stationary officers spotted him. The officer stated that Ponce appeared to notice the officers on the ramp and him, but then bypassed the exit. This officer did not see Ponce commit any traffic violations or observe any safety violations but pulled Ponce over for a safety check. After asking Ponce to exit the vehicle, the officer requested Ponce's driver's license and medical card; Ponce replied that both had been stolen. The officer then asked for Ponce's log and while Ponce was retrieving it, the officer asked where Ponce was coming from, to which he answered "Texas." The officer called for a canine handler.

After arriving on the scene, a new officer questioned Ponce about his criminal history. This new officer testified that Ponce became visibly nervous at this point and after admitting that he had been arrested before, Ponce became even more nervous. At that point, the new officer told Ponce that he would be running Ponce's criminal history electronically and asked for permission to search the truck. Ponce agreed and the officers found a package that later tested positive for cocaine.

Ponce was indicted in the Northern District of Georgia. The government introduced into evidence the rules and regulations upon which the administrative search was based, and the magistrate judge found the search constitutional. The district court agreed with the magistrate judge's report and recommendation, and

3

rejected Ponce's objections.  Ponce entered a conditional guilty plea, preserving his

right to appeal the denial of the motion to suppress.

## II.  DISCUSSION

On appeal, Ponce challenges only the initial stop.[1]  Ponce notes that neither

probable cause nor reasonable suspicion supported the initial stop, and he argues

that the courts below erred in concluding that the instant stop fell under the

administrative search exception to the warrant requirement.[2]

---

[1]      Thus, Ponce does not challenge the actions of the officers following the initial stop, nor does he challenge the voluntariness of his consent to search the truck that resulted in the discovery of the cocaine.

[2]      Ponce was initially charged with trafficking cocaine in state court.  Although he was convicted after a bench trial, the Georgia Court of Appeals reversed his conviction, holding that the stop was not a valid administrative search because the state had failed to introduce sufficient evidence of a regulatory scheme that could serve as a constitutionally adequate substitute for a search warrant.  Ponce v. State, 609 S.E.2d 736 (Ga. Ct. App. 2005).  Not only had the state failed to introduce as evidence any of Georgia's pertinent rules and regulations, but the court also held that it lacked authority to judicially notice the rules and regulations.  The Supreme Court of Georgia, however, reversed the court of appeals, holding that it should have taken judicial notice of any rules or regulations promulgated under Georgia's Administrative Procedure Act ("APA").  State v. Ponce, 619 S.E.2d 682 (Ga. 2005).  On remand, the Georgia Court of Appeals once again reversed Ponce's conviction, holding that the pertinent rules and regulations had not been promulgated under the APA, and thus the court could not judicially notice them.

The instant case of course results from the subsequent federal indictment.  In this federal case, the government did introduce into evidence the pertinent rules and regulations, unlike the prosecution in the state court.   Before the magistrate judge and district court below, and again in this appeal, Ponce has argued that the rules and regulations were not effective because they were not published pursuant to the APA.  However, as the district court noted, O.C.G.A. § 40-16-5(c) expressly exempts any requirement that these rules and regulations be promulgated pursuant to the APA, and Ponce does not challenge that holding on appeal.  Thus, the district court and magistrate judge below correctly rejected Ponce's argument that the rules and regulations were ineffective.  Accordingly, the district court and magistrate judge below correctly considered not

4

"We review the district court's denial of a motion to suppress evidence as a mixed question of law and fact. The district court's findings of fact are viewed under the clearly erroneous standard; its application of the law to those facts is subject to <u>de novo</u> review. We also construe all facts in the light most favorable to the prevailing party in the district court-here, the government." <u>United States v. Boyce</u>, 351 F.3d 1102, 1105 (11th Cir. 2003) (quotations and citation omitted).

<u>A. The Legal Framework</u>

Although a warrant is usually required when a search is undertaken to discover evidence of wrongdoing, there are "a few specifically established and well-delineated exceptions" to the warrant requirement under the Fourth Amendment. <u>United States v. Gonzalez</u>, 71 F.3d 819, 824-25 (11th Cir. 1996)(internal quotations and citations omitted). "[A]n administrative inspection of a closely regulated business is a well-established exception to the warrant requirement for a search." <u>Crosby v. Paulk</u>, 187 F.3d 1339, 1346 (11th Cir. 1999)

---

only the Georgia statute but also the pertinent rules and regulations, in resolving the crucial issue in this case. In the criminal proceedings against Ponce in the state court, the prosecution apparently never called to the state court's attention the fact that the Georgia rules and regulations were expressly exempted from the requirements of the APA. Accordingly, the state court resolved the crucial issue in this case by considering only the Georgia statutes, excluding from its consideration the significance of the Georgia rules and regulations. Thus, what might appear superficially to be tension between our decision and the decision of the state court is readily explained and resolved. We note incidentally that a reading of the decisions of the Georgia Court of Appeals suggests that there may be additional respects in which the factual record before the Georgia court differed from the factual record in Federal court.

(quotation omitted). The Supreme Court in New York v. Burger explained that "[b]ecause the owner or operator of commercial premises in a 'closely regulated' industry has a reduced expectation of privacy . . . and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment." 482 U.S. 691, 702, 107 S. Ct. 2636, 2643-44 (1987).

In Burger, the Court established a three-part test for determining whether a warrantless administrative inspection in a pervasively regulated industry[3] comports with the Fourth Amendment:

> First, there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made . . . .
> Second, the warrantless inspections must be necessary to further the regulatory scheme . . . .
> Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant.

Id. at 702-03, 107 S. Ct. at 2644 (quotations, citations, and alterations omitted).

Ponce raises no arguments on the first and second prongs of the Burger test; therefore, any argument on those issues is deemed waived. See Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (holding that issues not raised on appeal are deemed waived). Accordingly, only Burger's third prong is at

---

[3] Ponce concedes that the trucking industry is a pervasively regulated industry.

issue in this appeal. Of the third prong of this test, the Court stated:

> [T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

Burger, 482 U.S. at 703, 107 S. Ct. at 2644 (quotations and citations omitted).

At issue in Burger was a New York statute that permitted administrative searches of automobile junkyards. The statute provided, in pertinent part:

> Upon request of an agent of the commissioner or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.

Id. at 694 n.1, 107 S. Ct. at 2639 n.1 (quoting N.Y. Veh. & Traf. Law § 415-a5 (McKinney 1986)).

Examining the statute, the Court held that it constituted a constitutionally adequate substitute for a warrant. The Court held that the statute provided the owner with notice that the searches will be made on a regular basis and were not merely discretionary acts but rather were conducted pursuant to the act. Id. at 711,

7

107 S. Ct. at 2648. The Court also held that the time, place and scope of the inspections placed "appropriate restraints upon the discretion of the inspecting officers." Id. The Court explained:

> The officers are allowed to conduct an inspection only during the regular and usual business hours. The inspections can be made only of vehicle-dismantling and related industries. And the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises.

Id. at 711-12, 107 S. Ct. at 2648 (quotations, citations, alterations, and footnote omitted).

Other courts have applied the Burger test to substantially similar regulatory schemes governing administrative searches of commercial vehicles and found them constitutional.[4] See United States v. Delgado, 545 F.3d 1195 (9th Cir. 2008) (evaluating Missouri law); United States v. Castelo, 415 F.3d 407 (5th Cir. 2005) (evaluating Mississippi law); United States v. Maldonado, 356 F.3d 130 (1st Cir. 2004)(evaluating Maine law); United States v. Vasquez-Castillo, 258 F.3d 1207

---

[4] The federal regulations state that although the states may adopt regulations governing motor carrier safety, to the extent that the federal regulations are more stringent, they prevail. 49 C.F.R. § 392.2. As a result several states, including Georgia, Alabama, Maine, Tennessee, and Wyoming have adopted the Federal Motor Carrier Safety regulations. See United States v. Steed, 548 F.3d 961, 969-70 (11th Cir. 2008); United States v. Maldonado, 356 F.3d 130, 134 n.2 (1st Cir. 2004); V-1 Oil v. Means, 94 F.3d 1420, 1426 (10th Cir. 1996); State v. McClure, 74 S.W.3d 362, 371 (Tenn. Crim. App. 2001).

(10th Cir. 2001) (analyzing New Mexico law); United States v. Fort, 248 F.3d 475 (5th Cir. 2001) (evaluating Texas law); United States v. Dominguez-Prieto, 923 F.2d 464 (6th Cir. 1991) (analyzing Tennessee law).  While this court has never applied the Burger test to Georgia's state laws and regulations regarding safety checks of commercial vehicles, we did analyze Alabama's laws and regulations in United States v. Steed, 548 F.3d 961 (11th Cir. 2008).  There, we did not reach the conclusion that the laws and regulations were an adequate substitute for a warrant because the government had argued in the alternative that the stopping officer had a good-faith reliance on the statute's validity that was objectively reasonable, under Illinois v. Krull, 480 U.S. 340, 107 S. Ct. 1160 (1987).  Accordingly, we analyzed the Alabama law and regulations to ascertain that they were not "clearly unconstitutional."  Steed, 548 F.3d at 969.[5]

As in this case, the appellant's arguments in Steed centered on Burger's third prong.  First, we looked at the Alabama statute that governed warrantless searches of commercial vehicles; then we noted that Alabama had adopted the Federal Motor Carrier Safety Regulations ("FMCS"), which it authorized the Alabama Department of Public safety to enforce.  Id. at 969-70.  Addressing appellant's

---

[5]     Because the Government in this case concedes that it failed to make the Krull argument in the court below, we exercise our discretion not to entertain it on appeal.

argument that he lacked notice that he would be subject to the type of inspection at issue, we pointed to language in the Alabama statutes that "specifically provides that designated officials may inspect commercial vehicle records in order to ensure compliance with state and federal law." Id. at 970. Further, the federal regulations gave explicit notice that such stops were authorized for commercial vehicles. Id.

The Alabama statute also provided notice of which officers could conduct the inspections, as do the federal regulations. Id. at 971. We noted that the Supreme Court had held that the statute in Burger, which specified only that "any police officer" could perform the inspection, was sufficient. Id. By contrast, we observed that the statutes and regulations at issue more narrowly defined who could perform the inspections. Id.

Further elaborating on limitations placed on the discretion afforded to inspecting officers, the Steed court noted that the statute limited the scope of the inspections to the commercial motor vehicle industry. Id. We also observed that other courts had found the federal regulations had a "'carefully delineated scope' that 'suitably cabins the discretion of the enforcing officer'" by limiting the search to safety concerns and not authorizing a general search. Id. at 972 (quoting Maldonado, 356 F.3d at 136). On the issue of time restraints, appellant had argued that the statute's restriction to "normal business hours" was no restriction at all

because trucks operated around the clock.  We rejected this argument, citing other courts who had reasoned that imposing time limits on searches of commercial vehicles would eviscerate the search scheme and render it meaningless.  Id. Additionally, we noted that this circuit had previously approved an administrative search scheme with no time limits.  Id. at 973 (citing Crosby v. Paulk, 187 F.3d 1339, 1347 (11th Cir. 1999)).

With regard to place, we rejected the appellant's argument that the statute ran afoul of Burger because it had no place restrictions.  We observed that in Burger the failure to limit the number of searches had not invalidated the statute; rather, the Court had reasoned that the other restraints on discretion were adequate limits on the officers.  Id. (citing Burger, 482 U.S. at 711 n.21, 107 S. Ct. at 2648 n.21).  Other courts had observed that commercial vehicles can easily bypass fixed checkpoints and through citizens' band radios can avoid temporary ones.  Id. Finally, we cited other opinions that had upheld statutory search schemes that did not have place limitations.  Id.

In his last argument, the appellant in Steed asserted that the statute's failure to place any limitations on which vehicles the officers chose to inspect was fatal. We, however, found it impossible to reconcile that argument with the Burger opinion, where the Court expressed no concern that there was no record of why the

11

defendant's business had been chosen to be searched that day.  Id. at 974.

B.    Applying the foregoing principles here: Burger's third prong

As noted above, Ponce challenges only the satisfaction of Burger's third prong – whether the regulatory scheme provides a constitutionally adequate substitute for a warrant.  As Burger elaborated, this means, first, that the regulatory scheme must be sufficiently comprehensive and defined that the owner should be aware that his property will be subject to periodic inspections for specific purposes.  And second, it means that the regulatory scheme must adequately limit the discretion of the inspecting officers.  In determining whether the Georgia scheme satisfies Burger's third prong, we consider not only the relevant Georgia statutes, but also the Georgia rules and regulations.  And in this regard, we note that the Georgia rules and regulations incorporate, where applicable, the Motor Carrier Safety Regulations issued by the U.S. Department of Transportation, contained in Title 49 of the Code of Federal Regulations, Parts 350, 382, 383, and 390 through 397.  Ga. T.R. 4-1.1(a) (2002).

1.    Notice to owners

We readily conclude that the Georgia regulatory scheme provides ample notice to owners of commercial vehicles and drivers that a commercial vehicle operating upon the public highways will be subject to being stopped and inspected.

12

The Georgia statute provides:

> Certified law enforcement officers employed by the Department shall . . . [h]ave the power to stop, enter upon, and inspect all motor vehicles using the public highways for purposes of determining whether such vehicles have complied with and are complying with this chapter and other laws the administration or enforcement of which is the responsibility of the Department.

O.C.G.A. § 40-16-2(b)(3) (2002).[6] The pertinent regulations provide: "Every Law Enforcement Officer of the [DMVS][7] or other persons designated by [DMVS] are authorized to stop, enter upon, and perform inspections of motor carrier's vehicles in operation." Ga. T.R. 4-1-396.9(a) (2000).[8] The foregoing provisions are at least

---

[6] In 2005, the Georgia General Assembly replaced the DMVS with the Department of Driver Services and certain other of the DMVS responsibilities were given to other agencies. See Ga. L. 2005, p. 334, § 1-1/HB 501. The events at issue here occurred in 2003 and therefore are governed by the then extant Georgia provisions.

[7] When the Georgia General Assembly created the DMVS in 2000, the DMVS became the agency responsible for enforcing laws previously enforced by other agencies, such as the Georgia Department of Transportation, the Georgia Department of Revenue, and the Georgia Public Service Commission. All of the regulations of these other agencies that governed the responsibilities now assumed by the DMVS remained in full force and effect. O.C.G.A. § 40-16-5(d) (2000). Therefore, the Motor Carrier Safety Program's regulations refer to the Commission because they were initially promulgated by the Public Service Commission.

[8] Although the statute seems to include all motor vehicles, the regulations limit the inspections to the foregoing commercial vehicles. The regulations define a motor carrier's vehicles as vehicles used by "for hire motor common carriers, for hire motor contract carriers, forest products carriers, limousine carriers, private carriers, and any other person subject to the [DMVS]'s safety and hazardous materials jurisdiction." Ga. T.R. 3-1.5(a) (2000). Ponce does not argue that he was not driving a covered vehicle. In the case before us, the roadblock was aimed at commercial vehicles, which were pulled over without any visible external indications of safety violations; Captain Jones testified that non-commercial vehicles that were "causing imminent danger to the motoring public" would be pulled over.

as effective in providing notice as § 415-a5 of the New York regulatory scheme in Burger.[9] With respect to that New York statute, the Supreme Court in Burger held: "The statute informs the operator of a vehicle dismantling business that inspections will be made on a regular basis." Burger, 482 U.S. at 711, 107 S. Ct. at 2648. Accord Steed, 548 F.3d at 970; Maldonado, 356 F.3d at 136; Vasquez-Castillo, 258 F.3d at 1211; Castelo, 415 F.3d at 411.

                2.      Discretion of inspecting officers is adequately limited

We also believe that the discretion of the inspecting officers is adequately limited by the Georgia regulatory scheme. The regulatory scheme limits the officers who may conduct such inspections – i.e., only officers of DMVS "or other persons designated by [DMVS]." Ga. T.R. 4-1-396.9(a) (2002). With respect to this aspect, the Georgia scheme is more limited than was the New York scheme approved by the Court in Burger. There, "any police officer" was authorized to conduct the inspections. Burger, 482 U.S. at 694 n.1, 107 S. Ct. at 2639 n.1. Accord Steed, 548 F.3d at 971.

The Georgia regulatory scheme also limits the scope of the inspections authorized. First, the inspections are limited to vehicles using the public highways. O.C.G.A. § 40-16-2(b)(3) (2002). Second, the regulations limit the searches to

_____

[9]      See Burger, 482 U.S. at 694 n.1, 107 S. Ct. at 2639 n.1, for the text of § 415-a5.

14

commercial vehicles. Ga. T.R. 396.9(a) (2002). The Georgia regulations also describe specifically the cargo and documents to be inspected. Id. The Court in Burger cited a similar scope as a factor in the limitations of the discretion of the inspecting officers. Burger, 482 U.S. at 711, 107 S. Ct. at 2648. Accord Delgado, 545 F.3d at 1203 (noting approvingly the statute limited inspections to commercial vehicles for regulatory violations); Steed, 548 F.3d at 971-72 (approving statute as limited to commercial vehicles); Castelo, 415 F.3d at 411 (same). Indeed here, the stopping officer did not seek to search Ponce's cargo area until he had both called the canine handler and received consent, demonstrating that the scope of the inspection was limited.

Ponce argues that the lack of time and place restrictions placed upon the authorized inspections is fatal. We readily conclude that the absence of such restrictions is insignificant in the context of regulation of the commercial trucking industry. The case law is uniform in holding that neither time nor place restrictions would be feasible. Time restrictions are not feasible because trucks operate twenty-four hours a day. If inspections were limited to daylight hours, for example, commercial vehicles seeking to avoid inspection could simply travel at night. Dominguez-Prieto, 923 F.2d at 470 (stating that a time limitation would "render the entire inspection scheme unworkable and meaningless"); State v. Crum,

15

19 P.3d 172, 177 (Kan. 2001) (citing a study that showed permanent inspection stations operating at set hours cited 0.0% of trucks for safety violations while 15.4% of trucks stopped by the Kansas patrol had safety violations). See also Paulk, 187 F.3d at 1347-48 (11th Cir. 1999) (approving an administrative search although the regulatory scheme allowed for inspections at any time). Cf. Maldonado, 356 F.3d at 135-36 (stating that surprise is important for an efficacious inspection regime) (citing United States v. Biswell, 406 U.S. 311, 92 S. Ct. 1593 (1972)). Similarly, place restrictions are not feasible because trucks could easily avoid fixed checkpoints. Fort, 248 F.3d at 481 ("Commercial trucks pass quickly through states and out of the jurisdictions of the enforcement agencies. Because of the transitory nature of the commercial trucking industry, we conclude that the need for warrantless stops and inspections is even more compelling than the warrantless inspections of automobile junkyards upheld in Burger.") (citations and footnote reference omitted); V-1 Oil Co., 94 F.3d at 1427 ("Trucks can easily avoid fixed checkpoints and, by use of citizens' band radios, can avoid temporary checkpoints."); Dominguez-Prieto, 923 F.2d at 469 ("Like the stolen cars and automobile parts which pass quickly through an automobile junkyard, trucks pass quickly through states and out of the jurisdictions of the enforcement agencies; the facts presented here in support of warrantless inspections are more compelling than

16

those present in Burger.").

Ponce also argues that the regulatory scheme insufficiently limits the officers' discretion with respect to choosing which vehicles to inspect. However, we noted in Steed that a similar argument was difficult to reconcile with the fact that the Supreme Court in Burger noted that "[i]t was unclear from the record why on that particular day, Burger's junkyard was selected for inspection." Steed, 548 F.3d at 974 (quoting Burger, 482 U.S. at 694 n.2, 107 S. Ct. at 2639 n.2). The court in Steed also noted that the Sixth Circuit in United States v. Branson, 21 F.3d 113, 117 (6th Cir. 1994), held that: "The fact that the officers used no articulated method in deciding to inspect Branson's business does not distinguish this case from Burger." 548 F.3d at 974. Moreover, we note that Ponce can hardly complain about any random aspect, because the inspection of his vehicle occurred at a safety checkpoint, the purpose of which was to inspect commercial vehicles for safety violations.[10] Finally, we note that the Supreme Court in Burger held that particular "limitations, or the absence thereof, are a factor in an analysis of the adequacy of a particular statute, [but] they are not determinative of the results so long as the statute, as a whole, places adequate limits upon the discretion of the

_____

[10]     In its findings of fact, the magistrate judge credited Captain Jones' testimony that all commercial vehicles that passed by the checkpoint without stopping were more likely than not going to be pulled over and inspected, unless all of the available officers were tied up.

17

inspecting officers." Burger, 482 U.S. at 711 n.21, 107 S. Ct. at 2648 n.21.

Looking at the Georgia regulatory scheme as a whole, and especially in light of the rules and regulations, including the incorporated federal regulations, we conclude that the discretion of the inspecting officers is adequately limited.

C.     Conclusion

For the foregoing reasons, we conclude that the Georgia regulatory scheme satisfies the third prong of Burger; and the other two prongs not having been challenged, we hold that the instant stop fell within the administrative search exception to the warrant requirement.  Accordingly, the district court did not err in denying Ponce's motion to suppress.  The judgment of the district court is AFFIRMED.