[J-11-2019] [MO: Baer, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 41 MAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 654 MDA 2016 dated |
| | : | November 8, 2017, reconsideration |
| v. | : | denied January 18, 2018, Reversing |
| | : | the Order of the Clinton County Court |
| | : | of Common Pleas, Criminal Division, |
| JEFFERY CHARLES MAGUIRE, | : | at No. CP-18-CR-396-2015, dated |
| | : | March 22, 2016. |
| Appellant | : | |
| | : | ARGUED: May 15, 2019 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                    **DECIDED: August 22, 2019**

Jeffrey Maguire, operating a tri-axle dump truck, was stopped at the entrance to a landfill in Clinton County pursuant to a commercial vehicle checkpoint being conducted by Pennsylvania State Trooper Cory Beaver and other governmental inspectors. In this case, we must resolve the question of whether the warrantless and suspicionless seizure of both Maguire and the truck must be reviewed for constitutionality pursuant to the guidelines established by this Court governing vehicle checkpoints in *Commonwealth v. Tarbert*, 535 A.2d 1035 (Pa. 1987) (plurality) and *Commonwealth v. Blouse*, 611 A.2d 1177 (Pa. 1992), or pursuant to the "closely regulated business" exception to the Fourth Amendment to the United States Constitution, as articulated by the United States Supreme Court in *New York v. Burger*, 482 U.S. 691 (1987), and adopted by this Court in *Commonwealth v. Petroll*, 738 A.2d 993 (Pa. 1999).

As the learned Lead Opinion demonstrates, the conclusion that the latter test must apply to the circumstances at bar is inescapable. In *Petroll*, we unambiguously held that "trucking is a closely regulated industry." *Id.* at 1001. Bound to that holding by *stare decisis*, and absent a present challenge to that legal characterization, we are constrained to apply the *Burger/Petroll* rubric. Thus, I concur in that aspect of the Majority's opinion. I write separately, however, briefly to address the disconcerting way in which we reached the conclusion that "trucking" is a closely-regulated industry, and the potential confusion that may result going forward in commercial vehicle checkpoint cases.

Further, despite my agreement with the Lead Opinion that the *Burger/Petroll* test governs in this case, I disagree with the Majority's ultimate determination that Maguire waived one of his present arguments. *See* Maj. Op. at 17. I would conclude that Maguire adequately preserved his challenge to the systematic nature of the checkpoint to which he was subjected, and I would hold that the manner in which the checkpoint was conducted in this case was unconstitutional.

For these reasons, I join part I of the Lead Opinion. I concur in the result of part II. I respectfully dissent as to parts III and IV, as I would reverse the Superior Court's order.

The protections of the Fourth Amendment guard commercial property, like that owned by private persons, against unreasonable governmental intervention or inspection. *Burger*, 482 U.S. at 699 (citation omitted). "An owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable." *Id.* (citation omitted). However, a business owner's expectation of privacy in his or her commercial premises is lower than the expectation that one has in their private residence, and is at its lowest when the business at issue falls within a "closely regulated" industry. *Id.* at 700. Indeed, certain industries are so closely regulated that "no reasonable expectation of privacy . . . could exist for a proprietor over the stock

of such an enterprise." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978). In such circumstances, law enforcement may perform an "administrative search" of those commercial premises that "does not always require a showing of probable cause." *Petroll*, 738 A.2d at 1000 (citations omitted).

The process for determining whether a particular business is "closely regulated" necessitates a comprehensive evaluation of the nature of the business at issue, the legislative or regulatory scheme created to oversee the industry, and the history of that oversight. The typical "closely regulated" business is one that "poses a clear and significant risk to the public welfare." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2454 (2015). Because of the inherent risks that these industries create, "[i]n the name of protecting the public's welfare, the government often weaves an intricate web of regulatory scrutiny." *Petroll*, 738 A.2d at 1000. However, not all heavily regulated businesses constitute "closely regulated" ones for purposes of the Fourth Amendment's protections. Courts only may treat a business as such if the regulatory scheme is "sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Burger*, 482 U.S. at 705 n.16 (citation omitted). Finally, traditionally, a business will not be considered "closely regulated" when the scheme for oversight, be it legislative or regulatory, was new or recently created. To the contrary, "closely regulated" businesses classically are those that have had a "long tradition of close government supervision," or those whose governmental regulation has been "deeply rooted in history." *Id.* at 700 (citations omitted).

In the nearly fifty years since creating the "closely regulated" business exception to the Fourth Amendment's mandates, the Supreme Court of the United States has characterized only four types of businesses as "closely regulated," *i.e.*, those industries

that "have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." *Barlow's, Inc.*, 436 U.S. at 313. Those businesses include: the sale of liquor, *Colonnade Catering Corp. v. United States*, 397 U.S. 72 (1970); dealing of firearms, *United States v. Biswell*, 406 U.S. 311 (1972); mining, *Donovan v. Dewey*, 452 U.S. 594 (1981); and operating an automobile junkyard, *Burger*, 482 U.S. 691.

Most recently, the Supreme Court declined to include hotel operations within the list of "closely regulated" industries. *Patel*, 135 S. Ct. at 2454. The Court noted that "[t]he clear import of [its] cases is that the closely regulated industry . . . is the exception." *Id.* at 2455 (quoting *Barlow's, Inc.*, 436 U.S. at 313). The Court further cautioned that to "classify hotels as pervasively regulated would permit what has always been a narrow exception to swallow the rule." *Patel*, 135 S. Ct. at 2455.

As I read these Supreme Court cases, before designating an industry or a particular business as "closely regulated," a court should conduct a careful, historical, and comprehensive examination of the commercial activity at issue to determine whether there exists a deep-rooted, longstanding tradition of governmental intervention that is necessary to protect the public from a clear and substantial risk. This is particularly necessary in light of the magnitude of the consequence of being designated a "closely regulated" business. Once so characterized, there no longer exists an expectation of privacy in the premises (or vehicle) being searched and/or seized, which effectively strips away the protections of the Fourth Amendment.

Notably, the Supreme Court has not considered whether "trucking" is a "closely regulated" industry. This Court has. In *Petroll*, this Court unequivocally held that "trucking is a closely regulated industry." *Petroll*, 738 A.2d at 1001. In doing so, however, this Court identified, but did not examine, any of the considerations outlined by the Supreme

Court. Aside from citing a list of cases from our Superior Court and from other jurisdictions that have addressed the question, this Court offered little analysis. We noted that, in that case, "[t]he trial court and the Superior Court cite a variety of state and federal statutes and regulations to support their conclusion but primarily rely on a chapter of the Motor Vehicle Code. . . ." *Id.* at 1001. We then cited two of those provisions, one of which—75 Pa.C.S. § 4704—indicates that probable cause is a necessary prerequisite to an inspection, and the other—75 Pa.C.S. § 6308(b)—is a provision permitting systematic checkpoints of all types of vehicles. We contemplated those provisions during our application of the three-part *Burger/Petroll* test, but we offered no explanation as to why or how these provisions factored into the criteria established by the Supreme Court for determining whether an industry is "closely regulated."

We did not consider (in any manner, let alone comprehensively) the quantity of regulations applicable to "trucking," nor did we identify or contemplate the nature of any other statutes or regulations in an effort to ascertain whether those provisions, federal or state, amounted to an "intricate web of regulatory scrutiny." *Petroll*, 738 A.2d at 1000. Similarly, we failed to explore the history of the relationship between "trucking" and the government. Absent such information, one now can only take the Court's word for it that the regulatory and statutory scheme governing "trucking" is so "sufficiently comprehensive and defined, so that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Burger*, 482 U.S. at 705 n.16.

Stated plainly, in *Petroll*, this Court leapt to a conclusion without following any of the guideposts established by the Supreme Court of the United States. The *Petroll* Court's pronouncement that "trucking" is a "closely regulated" business, and thus excepted from the general protections of the Fourth Amendment, appears more akin to

an assumption reached by piggybacking off of the uncited, unverified, and unidentified work of the lower courts rather than a carefully contemplated legal holding worthy of the consequence attendant to that determination.

To be clear, today's Lead Opinion is in no way at fault for that determination or for applying it in the case *sub judice*. Bound by *stare decisis* and lacking a meaningful challenge to *Petroll*'s "trucking" designation, the Lead Opinion has no choice but to utilize the *Burger*/*Petroll* test.

Moreover, it seems to me that, if this Court were to perform the analytical task as developed by the Supreme Court's cases, "trucking" likely would again be deemed to be a "closely regulated" industry. But that is beside the point and the inquiry is best left for another day. What matters here is that this Court's failure to conduct a thorough analysis has created a significant risk of difficulties for courts considering the "closely regulated" business exception in the future when a commercial vehicle is at issue.

For instance, in *Petroll*, the industry that we contemplated was "trucking." Petroll was driving a tractor-trailer when he rear-ended a vehicle in front of him at a traffic light. *Petroll*, 738 A.2d at 996. Thus, the designation that "trucking" was a "closely regulated" business naturally encompassed the tractor-trailer. However, because we did not: (1) define the term "trucking;" (2) cite or discuss any "trucking"-specific regulations that compelled our conclusion that "trucking" was "closely regulated"; or (3) identify specifically the harm that any of those regulations sought to prevent, we failed to provide future courts addressing similar businesses with any relevant guidance, which, in light of the enormity of the consequence of being designated a "closely regulated" business, is disconcerting to say the least.

The instant matter is a perfect illustration of my concerns. The Lead Opinion notes that "it is indisputable that the government inspection authorized by Section 4704(a)(2)

and which took place in this case was aimed at the *trucking* business, which is a closely regulated industry." Maj. Op. at 15 (emphasis added). However, because we do not know what makes "trucking" a "closely regulated" business, we also do not know the limits on what activity constitutes "trucking." Maguire was not driving a tractor-trailer, like the driver in *Petroll*. He was driving a tri-axle dump truck. Is an operator of such a vehicle a "trucker?" Does driving a dump truck from one end of town to the other implicate the same safety considerations as does driving a tractor-trailer across three states on an interstate highway at seventy miles-per-hour? Perhaps what makes "trucking" a "closely regulated" business is a restriction on the number of hours that an operator may be on the road, or the weight and size of the vehicle, or maybe it is something else entirely. Is a dump truck subject to the same regulations and restrictions? Without knowing precisely what supported this Court's determination that "trucking" is a "closely regulated" business, a court is left to speculate as to whether the operation of a different class of commercial vehicle (like a dump truck) also is participating in a "closely regulated" industry.

The potential for confusion, and the concomitant risk of constitutional violations, extends to the many other commercial vehicles traveling on every street, alley, and interstate in Pennsylvania. Cement trucks, construction vehicles, a landscaper's pickup truck, street sweepers, U-Haul trucks, ice cream trucks, and amphibious tour vehicles are commercial vehicles subject to regulation and inspection, and each arguably poses a safety risk to pedestrians and citizen drivers, and, perhaps, may be subject to law enforcement checkpoints. If the protocol authorizing those warrantless and suspicionless seizures is challenged, a court will have to consider—as we do today—whether each of those commercial vehicles operates in a "closely regulated" industry, or whether the seizures should be evaluated under the *Tarbert/Blouse* guidelines. Unfortunately, neither

*Petroll* nor this case will be of any meaningful assistance in resolving those more challenging inquiries.

Maguire does not challenge the ruling that "trucking" is a "closely regulated" business and he does not argue that the operation of a dump truck is distinct from "trucking." Thus, again, the Lead Opinion is not wrong to review this as if it were a "trucking" case, and we are not presented with an opportunity to revisit *Petroll* or any of the questions left in the wake of its undeveloped holding. That task must await another day. Therefore, I concur with the Lead Opinion that the *Burger/Petroll* factors are applicable to this case, despite my concerns outlined above.

Although I agree with the Lead Opinion that the *Burger/Petroll* criteria govern such police-citizen encounters, I disagree with the manner in which the Lead Opinion ultimately resolves this case. In particular, I respectfully part ways with the Majority's determination that Maguire waived his argument that the checkpoint utilized in this case was not systematic. *Id.* at 17.

The overarching question presented in this case—whether to apply *Tarbert/Blouse* or *Burger/Petroll* to commercial vehicle checkpoints—is one of first impression. Although we deemed "trucking" to be a "closely regulated" business in *Petroll*, a designation that clearly is material for present purposes, we did not address commercial vehicle checkpoints. *Petroll* involved a challenge to the constitutionality of a search of a tractor-trailer after a traffic accident. *Petroll*, 738 A.2d at 996, 998. It simply was not a checkpoint case.

Thus, when Maguire filed his suppression motion in this case, the question of which of the relevant analytical tests applied to commercial vehicle checkpoints was an open question in Pennsylvania. Maguire argued that *Tarbert/Blouse* applied. He won. The Commonwealth appealed. Maguire was under no obligation to raise any other

issues, including any peripheral issues pertaining to the application of the *Burger*/*Petroll* criteria, which the Commonwealth (who lost at the suppression stage) argued was the applicable test.

The Superior Court reversed the suppression court, holding that the *Burger*/*Petroll* criteria applied to the checkpoint conducted in this case, not the *Tarbert*/*Blouse* guidelines. *See Commonwealth v. Maguire*, 175 A.3d 288, 293-94 (Pa. Super. 2017). The Superior Court then proceeded to apply the *Burger*/*Petroll* criteria in conjunction with the statute that authorized the checkpoint: 75 Pa.C.S. § 4704(a)(2)[1]. In discussing the *Burger*/*Petroll* criteria, the court held that this statutory provision satisfied the third criterion because the "statute is sufficiently specific to provide a constitutionally adequate substitute to the warrant requirement, *i.e.*, it advises the operator of a commercial vehicle that the regulatory search is being made pursuant to the law, it has a properly defined scope, and it limits the discretion of the inspecting officers." *Maguire*, 175 A.3d at 293. The panel continued, "[i]n particular, the statute limits the discretion of the inspecting officers by specifying the objects subject to the systematic inspection program—any vehicle, driver, documents, equipment, and load. It also identifies the purpose of the inspection—to ensure that vehicles meet established regulatory standards." *Id.* Finally, the Superior Court examined the manner in which the checkpoint was conducted by Trooper Beaver and his fellow inspectors, and concluded that Trooper Beaver's "system

---

[1]  Subsection 4704(a)(2) provides as follows:

**Systematic vehicle inspection programs.**--Any Pennsylvania State Police officer or qualified Commonwealth employee engaged in a systematic vehicle inspection program may inspect any vehicle, driver, documents, equipment and load to determine whether they meet standards established in department regulations.

75 Pa.C.S. § 4704(a)(2).

for selecting trucks to inspect sufficiently limits the discretion of the inspectors and meets the third element of *Burger*." *Id.* at 294.

The Superior Court undeniably incorporated and applied subsection 4704(a)(2) as part of its execution of its *Burger/Petroll* analysis. More importantly, in discussing the third criteron of the test, the Superior Court examined the checkpoint to determine whether it was operated in a systematic way so as to satisfy both subsection 4704(a)(2)'s systematic requirement and the Fourth Amendment pursuant to *Burger/Petroll*. As I view these circumstances, Maguire's present argument that the checkpoint did not satisfy subsection 4704(a)(2) is a fair argument in response to the Superior Court's *Burger/Petroll* analysis, and is an argument that fairly was encompassed in this Court's grant of *allocatur*. Moreover, because the argument reasonably arises from the Superior Court's analysis of the *Burger/Petroll* criteria, the first time that such examination occurred in this case, Maguire was under no obligation to raise the issue previously. Indeed, it is well-settled that, as appellee before the Superior Court, he was not required to raise this issue until now. *Commonwealth v. Shaffer*, ___ A.3d ___, 2019 WL 2509345, at *11 (Pa. 2019) (citation omitted).

Turning to the merits of the issue, I agree with Maguire that the protocol employed by Trooper Beaver in this case was not sufficiently systematic because it did not limit the discretion of the officers effectuating the warrantless and suspicionless seizures of the vehicles approaching the landfill.[2] Unlike typical checkpoints, the officers here were not

---

[2]   I concur with two aspects of Chief Justice Saylor's concurring opinion. As is evident herein, I too do not believe that Maguire waived his present challenge to the systematic nature of the checkpoint at issue. As well, I agree with Chief Justice Saylor that the nature of the search should be evaluated against the *Burger/Petroll* criteria, and that we should not adopt the analytical framework espoused by the United States Court of Appeals for the First Circuit in *United States v. Maldonado*, 356 F.3d 130, 136 (1st Cir. 2004), and adopted by the Lead Opinion in this case. *See* Conc. Op. at 2-3 (Saylor, C.J., concurring); Maj. Op. at 16-17.

directed to stop every truck, to stop every third truck, or to use some other system that would limit the discretion from the officers performing the seizures. Instead, the officers were directed simply to stop the next truck that approached the landfill whenever that officer became available. If an officer was inspecting another vehicle, filling out paperwork in his or her vehicle, or was just otherwise unavailable, an approaching truck was not stopped.

In my view, this protocol was too broadly defined to eliminate, or at least significantly curtail, the discretion of the officers operating the checkpoint. Having no specific direction as to which trucks to seize, the possibility for manipulation was too strong. The officer's only instruction was to stop the next truck when he or she became "available." The potential for abuse is evident, as one's decision as to when he or she is "available" can differ significantly. Moreover, such an amorphous standard allows for the potential that an officer can delay or extend a particular action, so as to be "unavailable," and seize only those trucks that he or she wants to seize. This opens the door to selection based upon bias or prejudice, precisely the evil sought to be avoided in systematic checkpoints.

To be clear, there is no evidence in the record that Trooper Beaver, or any other inspector, stopped Maguire, or any other truck, based upon bias, prejudice, or any other illicit motive. I have no reason to believe that the officers involved in this checkpoint actually abused the process utilized here. But that is not the point. Actual evidence of

---

However, I disagree with the Chief Justice's determination that the suppression court's ruling on the systematic nature of the checkpoint was a factual conclusion, and, thus, effectively unreviewable by this Court. *See* Conc. Op. at 5. To be sure, any facts found by the suppression court—if supported by the record—bind this Court. However, the question of whether those facts demonstrate that the checkpoint was conducted systematically, a statutory requirement and, at times, a constitutional inquiry, is a question of law, which is within this Court's power to answer. *See Siekierda v. Com., Dep't of Transp., Bureau of Driver Licensing*, 860 A.2d 76, 81 (Pa. 2004).

impropriety by a law enforcement officer during a checkpoint is not required. A reviewing court is not concerned with the subjective actions of any particular officer. A court must review the established protocol to ensure that it is operated on a systematic basis in order to limit as much as possible the potential for abuse, bias, or prejudice in deciding which vehicles to stop. This is true not only of checkpoints, but of all searches or seizures performed pursuant to the "closely regulated" business exception. *See Burger*, 482 U.S. at 703 (establishing that administrative searches of such business "must limit the discretion of the inspecting officers").

For these reasons, I would hold that the checkpoint was not systematic as is required by subsection 4704(a)(2), and, thus, also was unconstitutional because it failed to satisfy the third prong of the *Burger/Petroll* test. I would vacate the Superior Court's order, and I would remand the case to the suppression court for any further proceedings. Because the Lead Opinion charts a different course, I respectfully dissent.

Justice Donohue joins the concurring and dissenting opinion.